33 N.J. Super. 178 (1954)
109 A.2d 695
CHARLES GIUMARRA, PLAINTIFF-CROSS-APPELLANT,
v.
HARRINGTON HEIGHTS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT. CHARLES GIUMARRA, THIRD-PARTY PLAINTIFF,
v.
WILLIAM F. EHRET AND JOHANNA EHRET, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1954.
Decided November 23, 1954.
*181 Before Judges EASTWOOD, GOLDMANN and SCHETTINO.
Mr. James A. Major argued the cause for plaintiff-cross-appellant.
Mr. Warren Dixon, Jr., argued the cause for defendant-appellant.
The opinion of the court was delivered by GOLDMANN, J.A.D.
Defendant Harrington Heights, Inc. appeals from a Bergen County Court judgment denying its motion for entry of judgment in its favor on its counterclaim against plaintiff Giumarra in the sum of $13,012.40, and awarding only nominal damages in the sum of $1. Plaintiff cross-appeals from the dismissal of his complaint and from the award against him on the counterclaim.
By contract dated August 28, 1950, William F. Ehret and his wife agreed to sell to one Nalbandian approximately 81 acres of land owned by them in the Borough of Harrington Park, Bergen County. The contract contemplated that Nalbandian would assign to a corporation, and he did so assign to defendant Harrington Heights, Inc., of which he is the vice-president. The Ehret contract provided for consecutive conveyances of tracts out of the main acreage at $1,600 an acre; the first tract (of ten acres) was to be conveyed within 60 days of August 28, 1950, and each subsequent tract (of 13 to 15 acres) within six months from the last conveyance. Time was made of the essence as to the conveyance of the second and subsequent tracts, thus making April 28 and October 28 of each year the deadline for each of these conveyances. Deeds were to pass at the office of Draesel & Dorfman, attorneys for the Ehrets. The purchaser posted security to insure performance, the security to be considered liquidated damages.
*182 Harrington Heights, Inc. took title to four tracts and then, on October 10, 1952, entered into contract with plaintiff Giumarra whereby it agreed to assign to him the Ehret contract and its right thereunder to purchase the remaining land, then consisting of about 40 acres. Plaintiff was to pay defendant company $600 an acre over and above the price required to be paid for the land under the base agreement, of which sum defendant was to receive $400 an acre and the Ehrets $200 for consenting to modification of the terms of their agreement. Plaintiff paid defendant $1,600 as a deposit and agreed to pay $6,400 additional on or before December 1, 1952, "for which payment time is hereby made of the essence * * * at which time the agreement of August 28, 1950, will be assigned." Further, plaintiff was to give defendant an $8,000 second purchase-money mortgage on the lands in question on or before December 1, 1952, this amount to be subject to computation of the exact amount of land covered by the agreement at the rate of $400 an acre. Plaintiff agreed to assume the obligations of the basic contract and to perform them. He was to purchase the lands from the Ehrets in two sections, the first on or before December 1, 1952 and the second on or before October 31, 1953, each section to be approximately half the remaining lands. The consent of the Ehrets was made a condition of this contract to assign, inasmuch as the terms of the basic agreement had been modified.
Computation of the remaining acreage was to be made by a licensed civil engineer, the purchase price to be in accordance with that determination. Defendant company agreed to make immediately available to plaintiff a complete title abstract covering the premises described in the basic contract so that he might expeditiously complete his title search. Defendant also agreed to "provide, without cost * * * prior to December 1, 1952, a complete survey" of all property remaining in the Ehrets, "this survey to be prepared for the convenience of the said owners and the assignee." Defendant further agreed to install a culvert, the cost of which was to be divided equally.
*183 By agreement dated October 21, 1952 between defendant company and the Ehrets, they assented to the contract between defendant and plaintiff and its modification of the terms of the basic agreement. It was specifically provided that the consent so given was in no way to be construed as a release of the company by the Ehrets from the basic contract of August 28, 1952, whose terms were to remain in full force and effect.
Late in October 1952, after the Ehrets had thus given their consent to his agreement with defendant, plaintiff requested the local health officer, Abicht, to make percolation tests to determine the porosity of the lands. Abicht did so and then prepared his report stating that a more elaborate method for sewerage disposal than the standard type of septic tank would be required, and that extensive draining and filling would have to be done to prepare the greater portion of the tract for building purposes. By mistake this report was delivered to Nalbandian instead of plaintiff. According to Abicht, Nalbandian asked him to rewrite the report and tone it down, but he refused. The report was returned to Abicht the same day and he delivered it to plaintiff's office on November 14 or 15. Plaintiff claims he did not read the report, but that his son, who was his partner, did; however, he admits Abicht told him what was in the report. Abicht testified that when he spoke to plaintiff about the contents of the report plaintiff said he perhaps would not take title because of the work necessary to prepare the ground for building purposes. Plaintiff denies he told Abicht he was no longer interested in buying the property.
On or about November 12, 1952 Donigian, attorney and assistant secretary of defendant company, ordered a metes-and-bounds description survey from the engineering firm of Hobelman, Augenti & Kuhn. Copies of the order were sent to Major & Carlsen, plaintiff's attorneys, and Draesel & Dorfman, representing the Ehrets. Hobelman had made an outline survey of the Ehret property in 1950. From the field notes and computation sheets made at that time he proceeded to prepare metes-and-bounds, courses-and-bearings *184 descriptions of the two parcels still remaining in the Ehrets, showing respective acreages of 19.538 and 16.993. He delivered these to Donigian about November 22. He prepared no map, but it may be noted in passing that the outline map he had made in 1950 had been attached to the agreement of October 10, 1952.
Donigian delivered the two descriptions to Carlsen, plaintiff's attorney, at his office on November 25, together with a 60-year abstract of title. A copy of the descriptions was also given to Draesel & Dorfman at about the same time. Donigian testified he went to Carlsen's office because he had learned from Draesel, as well as from Nalbandian and Hobelman, that plaintiff was not going through with the deal. He asked Carlsen if this were so and Carlsen said that as far as he knew plaintiff would complete the transaction. He further testified that Carlsen said the metes-and-bounds descriptions were sufficient for his purpose. There was some discussion on that occasion about the title abstract. According to Donigian, Carlsen asked if he could certify title for a preliminary binder, and he answered he could do so with the Lawyers Title Insurance Company of Richmond. However, he got no further word from Carlsen to go ahead.
Carlsen phoned Donigian on November 26 and, according to the latter, told him that plaintiff was not going through with the deal because Abicht's report showed poor porosity conditions. Donigian denied that Carlsen had told him plaintiff would not take the assignment because of defendant's failure to supply a complete survey. Immediately after receiving this telephone call, Donigian wrote Carlsen as follows:
"Reference is made to our telephone conversation today wherein you advised me that Mr. Giumarra would default on his contract of October 10, 1952, with Harrington Heights, Inc. The most I can do at the present time is notify my clients and await their advices."
A copy was sent to Draesel & Dorfman.
*185 Carlsen apparently received this letter on December 1, and on that day wrote Donigian as follows:
"We are writing to acknowledge receipt of your communication of November 26th in the above matter. The contents of same are at variance with the discussion you and I had relative to the default on the contract.
We have not advised you that Mr. Giumarra would default on his contract of October 2, 1952 [sic], with Harrington Heights, Inc. We pointed out to you that Harrington Heights, Inc., had failed to provide without cost to our client, Charles Giumarra, a complete survey of all the property now remaining in the name of the owners, William F. Ehret and Johanna Ehret, under contract to be conveyed to Harrington Heights, Inc., [but] has given us a metes and bounds description of two tracts. We have no method whereby we could check the same with a survey. Mr. Draesel made it very clear prior to the execution of the contract that he and his client would insist upon such a survey. Hence, the reason for having included the paragraph relating to a survey in the contract. It was understood between all of the parties that the availability of this survey was a necessary pre-requisite to the obligation of the assignee to take over the contract with the Ehrets. And also for the Ehrets to carry on under all of the remaining provisions of the contract of the signing.
The default is that of Harrington Heights, Inc., and we are now making a demand on behalf of Charles Giumarra for repayment of all sums of money paid under the contract together with all damages flowing from the breach thereof by Harrington Heights, Inc. We have directed that our client compile his cost of engineering, etc., and upon receipt of same, we shall advise you that we shall expect payment of said costs."
Donigian says this was the first time Carlsen had raised any question about a survey. He did not answer the letter.
Donigian further testified that he had prepared a corporate resolution for defendant authorizing the assignment, and sent it to Draesel & Dorfman. All that remained to be done on December 1 was to endorse the Ehret contract so as to complete its assignment. Donigian admitted that he did not actually go to the Draesel & Dorfman office on that date, but he and his client were available throughout the day under an arrangement whereby Draesel was to call him as soon as they were needed.
Draesel testified he spoke to Carlsen on November 26, 1952 and asked if plaintiff were going to take the assignment. *186 He had heard from Abicht and Hobelman that he was not going to do so because of the porosity report, of whose contents Draesel knew. Carlsen informed him that plaintiff was not going through with the transaction because the report showed the farm was not good for building purposes. Draesel stated that the Ehrets were ready to proceed on December 1 and were in his office all day. He had received copies of the metes-and-bounds descriptions and was ready to close on that basis. The resolution of defendant company authorizing the assignment was in his hands before December 1; a warranty deed had been prepared. His arrangement with Donigian was that he was to call him the moment plaintiff and his attorney appeared at the office. They did not.
The testimony of Nalbandian, defendant's vice-president, was that defendant was ready, able and willing to carry out its agreement with plaintiff on December 1. As a matter of fact, defendant was ready to do so as early as November 26.
Carlsen's testimony runs counter to that of Donigian. He stated that when Donigian came to his office on November 25 he asked him if he would get title certified by the Lawyers Title Insurance Company of Richmond because he did not have time to go through the title abstract. Although Donigian had said he would, he did not do so. On that occasion Carlsen told Donigian that plaintiff was going through with the deal. The next day, November 26, he phoned Donigian asking if he had a survey; Donigian informed him he did not and that he understood plaintiff would not take the assignment as agreed because of the porosity tests. Carlsen says he informed him that plaintiff was satisfied, but they would have to have a survey.
He further testified that Draesel had phoned him the same day to say he understood plaintiff would not complete the deal. Carlsen informed Draesel it was true  there was no survey and he had told Donigian they were not going through with the deal. He denied having told either Donigian or Draesel that the reason plaintiff would not take the assignment *187 was because of the Abicht report; plaintiff was still satisfied despite the tests.
Carlsen also denied he had ever told Donigian that the metes-and-bounds descriptions were satisfactory. He admitted having received a copy of Donigian's order asking Hobelman for such descriptions but didn't consider it as satisfying the contract requirement that defendant provide a complete survey. He explained that he thought the metes-and-bounds descriptions were intended to satisfy that portion of the contract relating to a computation of the exact acreage by a civil engineer. (This provision, incidentally, speaks only of exact acreage and makes no mention of metes and bounds.) Carlsen also testified that the plot plan attached to the agreement to assign was unsatisfactory for checking purposes because it had no starting point or courses.
Carlsen admitted that his letter of December 1, 1952 in answer to Donigian's was intended to indicate that the agreement was at an end because of defendant's breach. He so considered it; however, he said he had not consulted plaintiff about this. He did speak to plaintiff a day or so later, and plaintiff advised waiting to see what happened. Not having heard from defendant, plaintiff instructed Carlsen to start suit. Neither Carlsen nor his client ever ordered a survey, but no explanation for not having done so was offered.
The final witness was Ehret who testified that he had on April 15, 1953 sold 12 1/3 acres out of one of the remaining parcels, at a price of $2,700 an acre, the buyer having an option on the rest.
Giumarra was the only witness on his own case. He testified he had never seen Carlsen's letter of December 1 to Donigian and had not authorized it. He said that he had decided on or about December 16, 1952 not to go through with the contract because of failure to supply a survey. He had not shown up at Draesel's office on December 1 for the same reason. Plaintiff insisted it was not true that the reason for his decision was the Abicht report. He had not spoken to Nalbandian after December 1, either about the survey or the consummation of the transaction.
*188 Plaintiff's action against defendant company was instituted December 17, 1952. The complaint referred to the contract of October 10 and the $1,600 down-payment. Plaintiff claimed breach of the contract because of defendant's failure to provide a survey, and demanded judgment of $2,000. Defendant answered, setting up as separate defenses: (1) the survey was for the mere convenience of the Ehrets and plaintiff, and did not constitute a material condition or obligation, so that defendant's failure to supply the survey provided no basis for plaintiff's refusal to perform; (2) anticipatory breach, in that plaintiff informed defendant prior to the time for performance that he would not carry out the terms of the agreement; (3) waiver, in that metes-and-bounds descriptions had been presented to plaintiff prior to the time for performance and he had accepted them in lieu of a survey; (4) estoppel, in that plaintiff induced the surveyor whom defendant had employed to prepare a survey, to desist therefrom; and (5) defendant was at all times ready, willing and able to perform the contract, had tendered performance, and plaintiff refused to accept the same and breached the contract.
By way of counterclaim, in two counts, defendant demanded judgment against plaintiff in the sum of $13,012.40 on the basis of breach of contract and anticipatory breach. This sum represented the price agreed to be paid defendant for the 36.531 acres at $400 an acre, or $14,612.40, less the $1,600 deposit. Defendant denied the counterclaim.
Plaintiff had also brought a third-party action against the Ehrets. This was dismissed on motion made at the close of plaintiff's case, without prejudice and without costs. The court also granted defendant's motion for involuntary dismissal at the close of plaintiff's case, stating that defendant's promise to provide a survey without cost to plaintiff was not part of the consideration for the contract to assign, and if such promise were considered a condition precedent, it was waived by plaintiff because he made no demand upon defendant for a survey and, according to his *189 own testimony, did not decide not to go through with the contract until December 16.
Plaintiff's motion for involuntary dismissal of the counterclaim was dismissed at the close of the entire case and a verdict directed in defendant's favor because of plaintiff's breach of contract. The court being of the opinion that no damages had been proved, directed that judgment be entered in defendant's favor for nominal damages of $1 only.

I
The testimony summarized above gives us not only the significant background of the dealings between the parties and their attorneys, but provides the perspective and solution to the problems raised on these cross-appeals.
Plaintiff contends the trial court erred in entering judgment of involuntary dismissal against him at the close of his case. The argument made is that he was justified in failing to perform the contract because defendant had not supplied a complete survey. The issue before the court on plaintiff's cross-appeal is, therefore, whether defendant's failure to supply a survey gave plaintiff legal justification for refusing to perform under the agreement. In short, was the providing of a survey a condition precedent to plaintiff's duty to perform, or was it at most a collateral or independent undertaking?
The provision of the October 10 agreement as to the survey was that defendant "shall provide without cost to the assignee prior to December 1, 1952, a complete survey of all property now remaining in the names of the owners [Ehrets] * * * this survey to be prepared for the convenience of said owners and the assignee." Nothing is said as to whom defendant was to give the survey, although it can reasonably be implied that he was to let the owners and plaintiff make such reference to it as they desired. Nor does the clause define what is meant by a survey. Hobelman, the only civil engineering expert who testified, said that he did make a survey and his metes-and-bounds descriptions *190 were based on it. When asked what a survey of the Ehret property would be, he said: "* * * what is needed for the occasion. A survey could be any step or number of steps towards securing a desired number of facts or one fact; it would still be a survey." He further stated that there are various types of surveys  a metes-and-bounds and area-of-property description, a contour map, a subdivision plan, a location survey, an outline survey. The metes-and-bounds, courses-and-bearings descriptions of the two tracts which he had prepared were, in his opinion, a survey. These descriptions were given to plaintiff; in addition, it will be recalled, attached to his copy of the agreement was the outline map prepared by Hobelman in 1950.
The very language of the clause relating to the survey raises grave doubt whether it can be considered of any materiality. The parties by their own recital declared it to be merely for the convenience of the Ehrets and plaintiff. Contrast this with the positive provision that defendant was to make available to plaintiff, immediately after the signing of the agreement, a complete title abstract in order to enable him "to expeditiously complete his title search." It seems entirely clear to us that the requirement to provide a survey was at most an independent covenant, for breach of which plaintiff, at best, might hold defendant liable in damages.
The modern concept is that in the case of bilateral contracts not only are the promises consideration for one another but the parties also contemplate that the performances promised shall be exchanged one for the other. Failure of consideration exists wherever one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance. Where the counter-promise to perform relates to a material matter, the disappointed party has the right to rescind the contract. 3 Williston on Contracts (rev. ed.), § 813, 814, pp. 2289, 2293-4; 1 Restatement of the Law of Contracts, §§ 266, 274, pp. 382, 399. By dealing with the question of non-performance by one party to a bilateral contract on the *191 principle of failure of consideration, the materiality of the failure can in each particular case be dealt with on its merits. Williston, § 815, p. 2297.
Courts commonly determine whether promises are dependent on one another by seeking out the intent of the parties. 17 C.J.S., Contracts, § 344, p. 798. Of course, where the parties express such an intention, that intention will govern. But parties commonly express no intention whatever as to whether the obligation of one shall be dependent on performance by the other. To look for and determine that there is an intention in such a case is to indulge in a fiction. As Williston observes:
"* * * if the intention of the parties is to be brought into the doctrine of conditions which are in truth constructive, it can only be an intention which the court assumes the parties would have had if they had considered the matter, and had made some provision regarding it. The only justification for such an assumption is the fairness of dependency, as compared with independency, of promises in bilateral contracts, * * *." (§ 825, pp. 2312-3)
The doctrine of constructive dependency of promises should therefore be rested solely on their fairness, and not on any intention of the parties where they express none. If promises are to be determined as mutually dependent and enforced as such, it should be because of the inherent justice of the situation and not the unexpressed intention of the parties.
We deal here with a contract which provides for a number of performances on each side of varying importance. It cannot be inferred there was any actual intention that if defendant defaulted in providing a survey for the convenience of the Ehrets and plaintiff, subsequent performance by plaintiff should not be rendered, for in our view the survey was not of material importance in the transaction considered as a whole. In the absence of a clearly expressed intention that the providing of a survey was to be a condition of plaintiff's performance, we cannot accept his contention that the consequences of defendant's default in providing the survey before December 1 would be to wholly excuse plaintiff from going through with the transaction. *192 3 Williston on Contracts (rev. ed.), § 829, pp. 2320-21; accord, 1 Restatement of the Law of Contracts, §§ 274-276, pp. 399 et seq. Tichnor Bros. v. Evans, 92 Vt. 278, 279, 102 A. 1031, L.R.A. 1918C, 1025 (Sup. Ct. 1918).
In Luce v. New Orange Industrial Ass'n., 68 N.J.L. 31, 34 (Sup. Ct. 1902), it was said:
"The weight of authority is that the failure to perform a subsidiary part of the contract will support an action for damages, but will not justify a rescission of the contract, unless the conduct of the party in default be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms."
Justice Van Syckle there quoted the oft-repeated principle laid down by Lord Mansfield in Boone v. Eyre, 1 H. Bl. 273n (1777):
"* * * The distinction is very clear; where mutual covenants go to the whole of the consideration on both sides, they are mutual conditions, the one precedent to the other, but where they go only to a part, where a breach may be paid for in damages, there the defendant has a remedy on his covenant, and shall not plead it as a condition precedent."
Cf. 17 C.J.S., Contracts, § 344(b), pp. 799, 800; O'Toole v. O'Toole, 10 N.J. Misc. 159, 162, 158 A. 337 (Sup. Ct. 1932).
Determining, as we do, that the furnishing of a survey was not a material element and was at most an independent covenant, the survey was merely to give rise to a cause of action for damages in plaintiff. It provided no legitimate reason for plaintiff's failure to perform the contract, and would constitute no bar to defendant's right to recover for breach of the contract. Rothman Realty Corp. v. MacLain, 21 N.J. Super. 172, 174 (App. Div. 1952); cf. Kinney v. Federal Laundry Co., 75 N.J.L. 497 (E. & A. 1907); see 17 C.J.S., Contracts, § 453, p. 934, § 476, p. 982.
Clearly, plaintiff breached the contract by failing to perform his obligation, and is therefore the defaulting party. As such, he cannot recover his deposit and the dismissal of *193 the complaint by the trial court was proper. Bernstein v. Rosenzweig, 1 N.J. Super. 48 (App. Div. 1948).
There is a suggestion in plaintiff's argument that his suit was for damages for failure to provide a survey. We do not so consider it. It was a suit for recovery of the initial deposit, based upon plaintiff's decision to rescind the contract.
Although the trial court assigned reasons other than ours for granting defendant's motion for involuntary dismissal of the complaint, the question to be determined upon review in this court is always "the propriety of the judicial action of the court below, and not the soundness of the reason which prompted it." McCarty v. West Hoboken, 93 N.J.L. 247, 248 (E. & A. 1919); and see Hughes v. Eisner, 8 N.J. 228, 229 (1951), where it was said: "Appeals * * * are taken from judgments and not from opinions."

II
Plaintiff's next point is that the trial court erred in finding he was liable to defendant on the counterclaim. The argument made in support infers that the trial court predicated its determination on the ground of plaintiff's anticipatory breach; that there was a conflict between the testimony given by Carlsen and that given by Donigian and Draesel, which conflict should have been resolved by the jury; and, in any event, Carlsen had no express authority to call the bargain off because of alleged breach and to write the letter he did on December 1. The argument proceeds on a false premise. The record is devoid of anything justifying an inference that the trial court found in defendant's favor on the ground of anticipatory breach. The court obviously determined that defendant was entitled to recover on its counterclaim because plaintiff had breached without legal excuse. And the uncontroverted fact is that plaintiff did so breach the agreement and therefore was answerable in damages.
We are not to be considered as overlooking the fact that there may have been an anticipatory breach in this case. *194 There is sufficient in the record to indicate it, particularly if we fasten our attention on what happened on November 25 and 26, as set out in our narrative of the testimony.
There undoubtedly was a breach by plaintiff on December 1. First, there was the Carlsen letter of that date; second, neither the plaintiff nor anyone on his behalf came to Draesel's office to close the transaction or communicated with that office, either on that day or thereafter; third, without making any demand for a survey, suit was instituted some two weeks later based upon plaintiff's election to rescind the contract. On the other hand, as far as defendant was concerned everything was in readiness to complete the transaction. The Ehrets were at Draesel's office on December 1; the warranty deed was ready for execution and delivery; the corporate resolution approving the assignment, prepared by defendant's attorney beforehand, was also ready; and despite what defendant and its attorney had heard, counsel waited at the other end of the telephone line, ready to go to Draesel's office with his client as soon as he was notified that plaintiff had arrived. The testimony was that defendant was ready, able and willing to perform on December 1, the date fixed by the October 10 agreement as being "of the essence."
There was no disputed question of fact regarding plaintiff's breach, and nowhere in the argument on this appeal does plaintiff contend he did not breach the contract on December 1, 1952. Rather, he seeks to justify it.
Defendant was not required to do more than it did in light of plaintiff's acts and words.

III
Plaintiff's final argument is that defendant did not prove any damages. The trial court having found that plaintiff had breached the contract, defendant moved for a direction of verdict in its favor in the sum of $13,012.40, together with interest and costs. The computation of this amount has already been explained. The stated ground for the motion was that the damages were liquidated and represented the *195 difference between what defendant would have received had plaintiff performed his bargain and what it did not receive. As noted, the court denied the motion and, after directing a verdict in defendant's favor on its counterclaim, ordered that judgment for nominal damages of $1 be entered because no damages had been proven.
Defendant's theory was, and is, that upon plaintiff's breach it was entitled to recover the value of its bargain. By the terms of the October 10, 1952 agreement plaintiff did more than merely agree to pay $400 an acre to defendant in return for the assignment of its contract with the Ehrets; he also agreed to perform the basic contract. Before that contract to assign was executed, defendant had the right to purchase the land from the Ehrets; thereafter it no longer had that right, but only the right to receive from plaintiff the agreed consideration of $400 per acre. The Ehrets, by consenting to the agreement between plaintiff and defendant, had recognized plaintiff as the person having the contractual right to purchase under the basic agreement, and they could not have legally conveyed to defendant without being liable to plaintiff.
Plaintiff insists that the rule of damages in a situation such as this is the one prevailing between a vendor and a vendee, and cites the cases of King v. Ruckman, 24 N.J. Eq. 298 (Ch. 1873) and Ganger v. Moffett, 8 N.J. 73 (1951). We do not consider the rule of damages laid down in these cases  the difference between the contract price and the market value at the stipulated time of delivery  as applicable.
Tague Holding Corp. v. Harris, 250 N.Y. 422, 165 N.E. 834 (Ct. App. 1929), decided by an eminent court, is in our view dispositive of the issue before us. There defendant entered into a contract to purchase from plaintiff company for $50,500, land which he knew it had contracted to buy from the owner for $45,000 and on account of which it had paid $2,000. Defendant defaulted, and plaintiff sued. It was held that plaintiff stood to lose the difference between $43,000 and $50,500, or $7,500, by reason of defendant's default. Defendant had paid plaintiff $5,050 cash on the contract. *196 The court held that the profit which plaintiff anticipated was within the contemplation of the parties; that the damages were measurable with absolute certainty, and therefore defendant was liable to plaintiff for $7,500 less $5,050, or $2,450. Cf. Lathrop v. O'Brien, 44 Minn. 15, 46 N.W. 147 (Sup. Ct. 1890).
In fixing damages, the general problem of the law is, and should be, to put a plaintiff in as good a position as he would have been had the defendant kept his contract. Defendant was entitled to recover the entire consideration for its contract to assign, for this was the profit contemplated by the parties. Certainly plaintiff knew how much defendant was making on the assignment; he knew how much he had to pay it per acre for the assignment and how much defendant was obligated to pay on the original contract, which latter obligation plaintiff took over. The court in Weiss v. Revenue B. & L. Ass'n., 116 N.J.L. 208, 210 (E. & A. 1936), held:
"Ordinarily, the prima facie measure of damages for the breach of a contract is the quantum of loss consequent thereon. The injured party is entitled to the value of the contract to him. It was this that he lost by the default of the other. Feldman v. Jacob Branfman & Son, Inc., 111 N.J.L. 37. But this general rule is subject to two qualifications designed to confine within reasonable limits the appraisement of the consequences of the default, viz.: First, the damages shall be those arising naturally, i.e., according to the usual course of things, from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as the probable result of the breach; and, second, they must be the reasonably certain and definite consequences of the breach, as distinguished from mere quantitative uncertainty. * * *"
The distinction between the present case and the usual vendor-vendee case is that here defendant did not own legal title to the land, but merely equitable title. Cf. 55 Am. Jur., Vendor and Purchaser, § 524, p. 919, and 52 A.L.R. 1529.
In permitting defendant to recover the full benefit of the contract to assign, we are not allowing him to recover twice. Under his agreement with the Ehrets, defendant would have had to take up the last two tracts on October 28, 1952 and *197 April 28, 1953. Its contract with plaintiff, consented to by the Ehrets, changed all this. The Ehrets were willing to deal with plaintiff on other terms and conditions. The contract to assign never having been consummated, the Ehrets proceeded to dispose of their remaining lands to others. The testimony is that they sold off part of the acreage in April 1953 at an increase in price, the buyer holding an option on the balance of the lands. Defendant no longer is in a position to take title to the lands and realize a profit on their sale.

IV
The damages flowing from plaintiff's breach were definite and determinable by mathematical calculation; they were clearly within the contemplation of the parties; they flowed naturally as a consequence of the breach, and under the principles we deem applicable to a situation of this kind, defendant was entitled to entry of judgment on his counterclaim against plaintiff for $13,012.40.
R.R. 1:5-4, made applicable to the Appellate Division by R.R. 2:5, provides that the court shall exercise such original jurisdiction as may be necessary to the complete determination of any cause on review. We will mold the judgment in favor of defendant on its counterclaim so that the amount of damages recoverable is $13,012.40.
The judgment of dismissal of plaintiff's complaint is affirmed, and the judgment in favor of defendant on its counterclaim against plaintiff is modified to provide for damages in the sum of $13,012.40, and as modified is affirmed.