BAK-A-LUM CORPORATION OF AMERICA, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. ALCOA BUILDING PRODUCTS, INC., A PENNSYLVANIA CORPORATION, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued October 20, 1975.—Decided January 28, 1976.

*Mr. Sheldon A. Weiss* argued the cause for Plaintiff-Appellant and Cross-Respondent (*Messrs. Diamond, Grossman, Pitman & Udine*, attorneys; *Messrs. Glauberman & Weiss*, of counsel).

*Mr. Walter F. Waldau* argued the cause for Defendant-Respondent and Cross-Appellant (*Messrs. Stryker, Tams & Dill*, attorneys; *Mr. Waldau and Mr. Richard R. Spencer, Jr.*, on the brief).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. Plaintiff corporation ("BAL" hereinafter) sued defendant ("ALCOA" hereinafter) for an injunction and damages for alleged breach of an exclusive distributorship of aluminum siding and related products manufactured by ALCOA. It was denied an injunction but awarded damages for breach of contract; at the same time the trial court granted defendant judgment on a counterclaim for merchandise sold to plaintiff, together with interest thereon. Plaintiff appealed on the ground the damages awarded were inadequate; the defendant cross-appealed, asserting its conduct was not actionable. The Appellate Division affirmed. We granted plaintiff's petition for certification and defendant's cross-petition. 68 *N. J.* 138, 139 (1975). Plaintiff raises the additional issue that in the light of the nature of defendant's conduct plaintiff should not in equity be held for interest on its admitted debt to defendant.

We find the record to support the trial court's finding of fact that in or about 1962 or 1963 BAL entered into a verbal agreement with ALCOA whereby BAL would be exclusive distributor in Northern New Jersey for ALCOA's aluminum siding and certain related products. Although the agreement did not preclude BAL handling other lines of siding, the understanding was that it would maintain an adequate organization and exert its best efforts to promote the sales of the ALCOA products, and the evidence and

trial findings were that BAL produced to the satisfaction of ALCOA, even meeting fixed quotas of sales set by ALCOA during the latter phase of the relationship.

ALCOA terminated the "exclusive" in January 1970 by appointing four additional distributors to share the North Jersey territory with plaintiff, thereby precipitating the controversy that gave rise to this action. The trial court, although refusing a request for a preliminary injunction against the termination of the exclusive distributorship, held after trial that there was a binding agreement between the parties terminable only after a reasonable period of time and on reasonable notice. It found that a reasonable period of time had passed before termination but that a reasonable period of notice of termination would be seven months. It established plaintiff's damages at $5,000 per month and entered judgment in plaintiff's favor for $35,000 together with interest from September 1, 1970.

In addition to a complaint that it established losses in sales profits as a result of the termination of the exclusive at a rate of $10,000 per month rather than at the $5,000 rate determined by the court, plaintiff's major grievance is that in the Spring of 1969, at a time when defendant had already decided upon the termination of the distributorship but was secreting that plan from plaintiff, the latter undertook a major expansion of its warehouse facilities at substantial added operating expense. Plaintiff asserts that defendant knew of and encouraged this step, leading plaintiff to believe it was well warranted in view of the expected enlargement of the business of both of the contracting parties. On the basis of defendant's concealment of its intentions in the face of plaintiff's incurrence of a five year lease obligation for the new space, plaintiff asserts it is entitled to additional damages from defendant for the excess of its expense for the period of the lease over its operating expenses in its former headquarters — a loss allegedly attributable directly to defendant's breach of contract.

The trial court found that if ALCOA's decision, made in January or February of 1969, to enlarge the number of North Jersey distributors, had been promptly communicated to BAL's president, "it is unlikely that he would have signed the lease [for the new quarters] in April [1969] without first getting from [ALCOA] the assurance of continuance of the distributorship which he sought to get after the lease was signed". The court further found that all the circumstances surrounding the defendant's attitude to and treatment of plaintiff preceding and attending the disruption of the contractual arrangement "bespeak a certain hypocrisy as well as ruthlessness on the part of [ALCOA] toward its distributor of many years". The court further "surmised" that the reason defendant had concealed during the year 1969 its intention to terminate plaintiff's exclusive even though it had arrived at that intent before plaintiff entered into the new lease in 1969 was "that the men at [ALCOA] in charge of sales thought a period of secrecy ending with a sudden announcement to Mr. Diamond [plaintiff's president] of the accomplished fact of new distributors would avoid any risk of cooling plaintiff's interest in selling ALCOA products during the several months before the new distributors were named and made ready to go". Indeed, defendant's salesman induced plaintiff in January 1970, just before the announcement of the termination of the exclusive, to order $150,000 worth of merchandise — a very heavy order for that time of year.

In fixing seven months as a reasonable period of notice of termination of the exclusive agreement the trial court stated that the criterion for such a period of notice is the amount of time the notified party needs to make adjustments and to plan and arrange for business activities to replace those which are to be eliminated. However the court apparently placed little if any weight on the circumstances of the new lease as an element going to the reasonableness of the period for notice of termination, although it stated that the lease was a "factor" for consideration. It pointed out that the

decision to undertake the lease was plaintiff's and that plaintiff was able to use the space to store merchandise other than that purchased from defendant as well as defendant's lines.

■ ■ Our review of the record leads us to concur in the trial court's holding that there was a valid distributorship agreement terminable only on reasonable notice. See Annot., 19 *A. L. R.* 3rd 196 (1968), § 12 [a] at 292; 9 *Williston, Contracts* (3rd ed. 1967) § 1017A at 150–152; *J. C. Millett Co. v. Park & Tilford Distillers Corp.,* 123 *F. Supp.* 484, 492 (N. D. Calif. 1954); *California Wine Ass'n. v. Wisconsin Liquor Co.,* 20 *Wis.* 2d 110, 121 *N.W.* 2d 308, 316–317 (Sup. Ct. 1963); *Cromwell v. Gruber,* 7 *Wash. App.* 363, 499 *P.* 2d 1285, 1288 (Ct. App. 1972); cf. *Ass'n. Group Life, Inc. v. Catholic War Veterans,* 120 *N. J. Super.* 85, 96 (App. Div. 1971), mod. 61 *N. J.* 150 (1972). Plaintiff's contention that the agreement was not terminable at all without "cause", based on the recent holding of this court in *Shell Oil Co. v. Marinello,* 63 *N. J.* 402 (1973), is without merit. The "franchise" agreement here is in no sense comparable with that which produced the holding of non-terminability in *Shell.*

However, we are constrained to differ with the trial court's assessment of seven months as an adequate period for notice of termination of this agreement. It may be true that defendant ordinarily would be under no strictly legal obligation to inform plaintiff that it was about to terminate its exclusive distributorship although it knew that in all probability plaintiff was enlarging its plant upon an assumption of the continuation of the business arrangement for the indefinite future. However, we have been at pains recently to point out that "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good

faith and fair dealing.'" *Association Group Life, Inc. v. Catholic War Vets. of U. S.,* 61 *N. J.* 150, 153 (1972). See also *Palisades Properties, Inc. v. Brunetti,* 44 *N. J.* 117, 130 (1965). In the first cited case we distinguished between an absence of literal violation of a contract and the breach of the implied covenant of good faith therein which could give rise to the sanction of damages. 61 *N. J.* at 153–154.

So, too, here. While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing similarly persisted between them. In such circumstances defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation consituted a breach of the implied covenant of dealing in good faith of which we have spoken. As such it must be given substantial weight in determining the reasonableness of a period of notice of termination of the distributorship.

We cannot, however, agree with plaintiff that the period should encompass the remaining 4½ years of the lease as of the date of breach. The evidence justifies the conclusion that the prospects were fair for ultimate utilization to a substantial extent of the expanded warehouse space for new business plaintiff was able to obtain after defendant's breach or for other means of mitigating that phase of the damage attributable to defendant's conduct.

Exercising our original fact finding jurisdiction in order to bring this litigation to a close, it is our determination that a reasonable period of notice of termination of the distributorship, under all the circumstances, would have been 20 months.

Moreover, we find unwarranted the trial court's determination of plaintiff's monthly losses of profits of sales at $5,000 in the face of apparently unchallenged proofs by plaintiff, accepted by the court, that the damage figures were

about $10,000 monthly. The trial court cut the latter figure on the basis that plaintiff made no allowance (a) for substitute business it might have developed or (b) the sales plaintiff might have made as sole distributor to the new distributors at a lower mark-up. As to (a), there was no direct evidence that the ALCOA business which plaintiff lost was replaced in the sense that plaintiff could not have handled any new business along with the lost ALCOA business. As to (b), this factor was apparently specifically allowed for in plaintiff's witnesses' testimony. However, allowing for the trial court's feel for the credibility of the pertinent proofs, and taking into account what we have just said, we are led to fix the plaintiff's monthly losses at $7,500, or a total for the 20 months of $150,000, with interest from October 1, 1971 (20 months after breach).

The trial court awarded defendant prejudgment interest on its counterclaim for $463,884.55, except to the extent of $154,408.60, that being the amount of the orders placed by plaintiff immediately prior to the announcement of the termination. As to the latter sum, interest was not to begin until September 1, 1970.

██ ██ We conclude that prejudgment interest should not have been awarded to defendant on its counterclaim at all. Interest does not run on liquidated claims as a matter of course, but "in accordance with principles of equity", *Deerhurst Estates v. Meadow Homes, Inc.*, 64 *N. J. Super*. 134, 155 (App. Div. 1960), certif. den. 34 *N. J.* 66 (1961). Under all the circumstances here obtaining, and recounted above, the equities preclude allowance of interest to the defendant.

We have considered all other contentions urged on both the appeal and the cross-appeal, and find none requiring comment.

On defendant's appeal the judgment is affirmed, with costs. On plaintiff's appeal the judgment is modified in accordance with this opinion, with costs to plaintiff.

*For affirmance (defendant's appeal) and for modification (plaintiff's appeal)*—Chief Justice HUGHES, Justices MOUN-TAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CON-FORD—6.

*For reversal*—None.