252 N.J. Super. 477 (1991)
600 A.2d 148
BURTON PICKETT, PLAINTIFF-RESPONDENT,
v.
LLOYDS (A SYNDICATE OF UNDERWRITING MEMBERS) AND PEERLESS INSURANCE AGENCY, INC., DEFENDANTS-APPELLANTS, AND ROBERT K. KAST ASSOCIATES, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1991.
Decided December 17, 1991.
*480 Before Judges PETRELLA, ASHBEY and A.M. STEIN.
Anthony P. Pasquarelli argued the cause for appellants (Methfessel & Werbel, attorneys; Anthony P. Pasquarelli, on the brief).
Roger W. Thomas argued the cause for respondent (Dolan and Dolan, attorneys; Roger W. Thomas on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Lloyds, an underwriting syndicate, and Peerless Insurance Agency, Inc. (Peerless) appeal from a jury award of $70,000 in compensatory damages to plaintiff Burton Pickett. The jury found those defendants failed to exercise good faith and fair dealing. Peerless was held 60% negligent and Lloyds 40% negligent in the handling of Pickett's physical property damage claim. The judge denied post-judgment alternative motions for judgment notwithstanding the verdict, a new trial, and remittitur.
On their appeal, Lloyds and Peerless argue that (1) Pickett's claim for extra-contractual damages cannot be maintained under the physical damage policy; (2) his damages occurred prior *481 to any breach of the insurance contract; (3) his signing of the release as a precondition to payment effectively released any claims against Lloyds; and (4) the jury determination was a result of passion or prejudice.
Pickett obtained a $30,000 policy, with a $1,000 deductible, on his 1983 Mack tractor from Lloyds through Robert K. Kast Associates (Kast Associates).[1] Notification of claims under the policy were to be directed to Peerless, a surplus lines agent.
Pickett and his tractor were involved in a January 13, 1987 accident on Interstate 70 in Columbus, Ohio in which his vehicle was "totalled." Pickett had been hauling freight for Superior Carriers for 37 years. He was an owner-operator whose arrangement with Superior Carriers allowed him to build up seniority status which gave him more desirable and lucrative work assignments. In the event of an accident Superior Carriers gave an owner-operator 60 days to replace the damaged vehicle and resume working in order to maintain seniority status. In Pickett's case, Superior Carriers extended the 60-day period for an additional 30 days.
At the time of the accident, Pickett's vehicle was insured under Lloyds' physical damage policy which provided in part:
5. PROOF OF LOSS. Within sixty (60) days after loss or damage, unless such time is extended in writing by the Underwriters, the Assured shall forward to the Underwriters a statement, signed and sworn to by the Assured, stating the place, time and cause of the loss or damage, the interest of the Assured and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all other insurance, whether valid and collectible or not, covering said property....
6. PAYMENT OF LOSS. The loss shall in no event become payable until sixty (60) days after the verified proof of loss herein required shall have been received by the Underwriters and, if appraisal is demanded, then not until sixty (60) days after an award has been made by the appraisers.
* * * * * * * *
*482 On January 14, 1987 Pickett reported the accident to Superior Carriers. It in turn reported it to Kast Associates. Pickett then phoned Kast Associates and spoke to Susan Lopes. Lopes reported the claim to Diane Pavlik of Peerless on the same day. In her transmittal letter to Pavlik Lopes wrote: "Please process this claim as soon as possible." On January 19, Pavlik faxed the claim information to Lloyds in London.
On January 21, 1987, Lopes sent additional information to Pavlik and also advised her that Pickett was out of work until his vehicle could be repaired.[2] At Lloyds' direction Pavlik mailed the claims information on January 23 to John Easterman, purportedly a claims adjuster in Ohio. The envelope was returned to Pavlik on February 4 for lack of a forwarding address.
Pickett also attempted to contact Easterman. Upon learning that Easterman's claims adjustment agency did not exist at that location, Pickett contacted Pavlik at Peerless. Pickett testified that Pavlik was "very bitter" about speaking to him and did not give him any information. He said "she was very bitter to the fact that I called her personally and she wanted to know where I got her telephone number from." That was the only time Pickett had direct contact with anyone at Peerless.
Lloyds supplied Peerless with new telephone numbers on February 6, 1987. Pavlik used one of the numbers to reach Michigan Claims Service and provided it with the claim information. She received an adjuster's report from Michigan Claims on March 9 and said she forwarded it to Lloyds so that a proof of loss form could be issued to the adjuster.
On March 12, 1987 Pavlik received a telex from Lloyds inquiring about Michigan Claims' involvement instead of Easterman. It also developed that Michigan Claims never received a copy of the Lloyds policy from Pavlik and was not informed *483 that the policy was limited to physical damage. Apparently, it unnecessarily investigated liability as well as physical damage.
Lloyds approved issuance of the proof of loss statement on March 25, 1987 and requested a copy of Michigan Claims' final report. On April 13, 1987, three months after the accident, Pickett lost his seniority status at Superior Carriers. Six days later Pickett received the proof of loss form from Michigan Claims. The following day, April 20, in order to obtain payment, Pickett signed and returned a form entitled "PROOF OF LOSS, SUBROGATION AGREEMENT, AND AUTHORIZATION TO PAY ACCOUNTS" which contained the following paragraph:
In consideration of such payments the said insurance company is hereby discharged and forever released from any and all further claim, demand and liability whatsoever for said loss or damage, under and/or by reason of said Policy.
Pickett testified that when he signed the document he did not read it in its entirety.
Michigan Claims received the signed proof of loss statement on April 23 and forwarded it to Peerless, which subsequently sent it to Lloyds in London. Lloyds apparently received it by May 14. A check to satisfy Pickett's claim was supposedly mailed to Michigan Claims on June 19, but was not received until July 2. However, the check was mistakenly made payable to Michigan Claims rather than to Pickett and the lienholder on the vehicle.[3] Pickett testified that during this time period both Peerless and Michigan Claims had stopped taking his phone calls.
It was not until August 1987 that the bank received its share of the proceeds. Pickett received the balance in September 1987.
In May 1987 Pickett accepted re-employment as a "company driver" for Superior Carriers, at a substantially lower income *484 than he made as an owner-operator. He was 61 years old at the time of the accident and had intended to work for four more years. The parties stipulated to Pickett's earning for the four years preceding the accident and the three years following the accident.
From January through March 1987, Pickett attempted to obtain a bank loan to purchase a substitute tractor. However, his bank was unwilling to loan more funds while the previous loan remained outstanding. Pickett did take out a series of short-term loans to meet on-going business related expenses. He withdrew $44,092 from his Keogh and IRA plans to meet expenses incurred as a result of the loss of his vehicle. He also said he had been promised the right of refusal to purchase the salvage from the totalled tractor, but Michigan Claims eventually denied him this opportunity.
At the close of the case, defendants moved for involuntary dismissal. The judge determined that Pickett did not establish a standard of care that Kast Associates, as his agent, may have breached, and that any role it may have played in contributing to the delay in processing the claim would have been as Lloyds' agent, and thus imputed to Lloyds. The judge dismissed the complaint as to Kast. Lloyds' and Peerless's motions to dismiss were denied. The judge considered that Pickett's evidence, including testimony that Pavlik refused to take his calls, if believed by the jury, was sufficient to establish that Lloyds and Peerless had acted negligently in failing to expedite Pickett's claim.
The judge instructed the jury, among other things, on reasonable care, the prudent man standard and foreseeability, the duty of good faith and fair dealing, agency, vicarious liability, damages and mitigation of damages. He also instructed on the time requirements for payment of a claim as stated in the policy and under N.J.A.C. 11:3-10.15.
In returning its verdict for Pickett the jury found as fact that: (1) Peerless was directly responsible to Pickett for lack of *485 good faith and fair dealing outside of its agency relationship with Lloyds, and its negligence was a proximate cause of his damages; (2) Lloyds was negligent, either directly or through its agents, and this proximately caused Pickett's damages; (3) Pickett did not release any claims for handling of his claim by signing the proof of loss; (4) Pickett was not negligent; and (5) Peerless was 60% negligent, and Lloyds was 40% negligent.

I
The issue of damages for delay by an insurer in handling claims is somewhat novel in this State.
We reject Lloyds' and Peerless's arguments that its entire relationship with Pickett should be considered contractual, and thus defined solely by the terms of the policy. The measure of damages here need not necessarily be limited to those ordinarily imposed for breach of contract, i.e., those damages reasonably foreseeable and contemplated by the parties at the time of the contract. In any event, the damages here also met that test.
We conclude that a tort action was cognizable based on Pickett's proofs that the insurer failed to act in good faith and that there was a failure of Lloyds and Peerless to timely resolve his claim. This constituted bad faith in and of itself where Lloyds and Peerless had notice of the urgency of the claim and the serious impact on Pickett's potential livelihood.

A.
In Polito v. Continental Casualty Co., 689 F.2d 457, 463 (3d Cir.1982), the Circuit Court correctly noted that New Jersey courts imply a duty of good faith and fair dealing in all contracts, citing Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 207 A.2d 522 (1965). See also Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc., 69 N.J. 123, 351 A.2d 349 (1976); Association Group Life, Inc. v. Catholic War *486 Veterans of America, 61 N.J. 150, 293 A.2d 382 (1972). The Polito court recognized:
The doctrine of an implied covenant of fair dealing is fully applicable to insurance contracts. E.g., Fireman's Fund Insurance Co. v. Security Insurance Co., 72 N.J. 63, 367 A.2d 864 (1976); Association Group Life, Inc. v. Catholic War Veterans of America, 61 N.J. 150, 293 A.2d 382 (1972). Thus we conclude that the New Jersey courts would recognize that casualty insurers undertake an implied contractual duty, as fiduciaries to parties with whom they have a contractual relationship, to act in good faith and to deal fairly in the settlement of claims, and that such an implied contractual duty supports a claim for consequential damages. Our prediction in this respect is fortified by the provisions of N.J. Stat. Ann. 17B:30-13.1 .. . [689 F.2d at 463].
See also DiSalvatore v. Aetna Casualty & Surety Co., 624 F. Supp. 541 (D.N.J. 1986).
Although defendants rely on Wine Imports, Inc. v. Northbrook Property & Casualty Ins. Co., 708 F. Supp. 105 (D.N.J. 1989), we disagree with that case's analysis of New Jersey law. Wine Imports relied on Garden State Community Hospital v. Watson, 191 N.J. Super. 225, 465 A.2d 1225 (App.Div. 1982), certif. denied 94 N.J. 518, 468 A.2d 176 (1983), as support for its determination that New Jersey law prohibits recovery of consequential and punitive damages in an action arising from an insurance coverage dispute. However, in Garden State the insured sought "compensatory and punitive damages for `severe emotional and physical distress' because of `intentional and wrongful conduct.'" [191 N.J. Super. at 226, 465 A.2d 1225]. We there held that damages for emotional and physical distress, as well as punitive damages, were not compensable in the type of action brought, whether sounding in tort, contract or both, when the wrongful conduct is breach of the duty of fair dealing. We adhere to that view as to those types of damage claims.
Wine Imports also mistakenly relied on Ellmex Construction Co., Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 494 A.2d 339 (App.Div. 1985), certif. denied 103 N.J. 453, 511 A.2d 639 (1986), which involved a coverage dispute arising from a "builder's risk" policy. The insurer in Ellmex disclaimed coverage for a loss caused by vandalism, relying on a policy provision which excluded coverage "if the described dwelling had *487 been vacant beyond a period of 30 consecutive days immediately preceding the loss." Id. at 200, 494 A.2d 339. We left open the issue of punitive damages and characterized Ellmex as involving "a traditional breach of contract grounded in a mistaken notion of legal duty." Id. at 208, 494 A.2d 339. Coverage was never disputed in the case before us. Thus it is not just a traditional breach of contract case.
Likewise, other cases relied on in Wine Imports do not support defendants' position. The plaintiff in Pierzga v. Ohio Casualty Group of Ins. Companies, 208 N.J. Super. 40, 504 A.2d 1200 (App.Div. 1986), certif. denied 104 N.J. 399, 517 A.2d 402 (1986), was injured while a passenger in an automobile whose owner was insured by Ohio Casualty. Eventually, through settlement and summary judgment, plaintiff recovered her PIP benefits. Id. at 43, 504 A.2d 1200. However, she asserted claims for punitive damages and damages under the Consumer Fraud Act (N.J.S.A. 56:8-1 et seq.) and the Insurance Trade Practices Act (N.J.S.A. 17:29B-1 et seq.) due to the insurer's delay in payments. Although "troubled by the conduct of the insurance carrier," we denied plaintiff's claim for punitive damages and recovery under the Consumer Fraud Act essentially on the grounds that it was "unwise to allow plaintiff a recovery beyond her substantial remedies under the No Fault Act and court rules." Id. at 42, 504 A.2d 1200. We considered further recovery contrary to the comprehensive policy of the No-Fault Act (N.J.S.A. 39:6A-1 et seq.). Id. at 45-46, 504 A.2d 1200. We also denied recovery under the Insurance Trade Practices Act since the no-fault scheme was designed to discourage litigation and the "statute [Trade Practices Act] applies to wrongs to the public rather than any individual...." Id. at 47, 504 A.2d 1200. Neither punitive damages nor the No-Fault Act is involved here.
Cases relied upon in Wine Imports to the effect that punitive damages are not recoverable where there has been a delay in payment are clearly inapposite to the issue before us. See, e.g., Meier v. New Jersey Life Ins. Co., 195 N.J. Super. 478, 489, 480 *488 A.2d 919 (App.Div. 1984), aff'd 101 N.J. 597, 503 A.2d 862 (1986); Kubiak v. Allstate Ins. Co., 198 N.J. Super. 115, 119-120, 486 A.2d 879 (App.Div. 1984); Milcarek v. Nationwide Ins. Co., 190 N.J. Super. 358, 368, 463 A.2d 950 (App.Div. 1983). Thus, in our view, the analysis in Wine Imports was flawed and gave an erroneous prediction of New Jersey law. Compare Oritani Savings & Loan Assoc. v. Fidelity & Deposit Co. of Maryland, 744 F. Supp. 1311, 1321 n. 13 (D.N.J. 1990) (disputes that cases cited in Wine Imports address issue of consequential damages).
In Noye v. Hoffmann-LaRoche, Inc., 238 N.J. Super. 430, 570 A.2d 12 (App.Div. 1990), certif. denied 122 N.J. 146, 584 A.2d 218 (1990), we recently held that tort damages were not recoverable for breach of an implied covenant of good faith in an employment contract based on the company's employee manual. Despite a finding that plaintiff had suffered no economic damage from the breach of contract, the jury awarded Noye $750,000 in compensatory damages for breach of an implied covenant of good faith in the employment contract. In reversing this determination, we distinguished other contract cases, including insurance cases, and held that tort damages do not lie for breach of an implied covenant of good faith and fair dealing in an employment contract case. Id. at 436, 570 A.2d 12. We distinguished cases holding insurance companies liable to their insureds for consequential losses resulting from the carrier's failure to use good faith.[4]Ibid.
Both parties rely on Assembly Bill 2200 (1990), presently pending in the New Jersey Legislature, which would sanction a cause of action by an insured against the insurer for damages resulting from violations of the claim settlement practices standards in N.J.S.A. 17:29B-4.[5] The bill would expressly provide *489 for recovery of consequential damages incurred by an insured as a result of an insurer's violation of the laws governing Trade Practices and Unfair Claims Settlement Practices. Pickett argues that this pending bill is another reason to sustain the jury's verdict. On the other hand, defendants argue that the bill reflects that existing law does not permit recovery of extra-contractual damage claims. Neither argument is persuasive.
A pending bill provides little support for either argument. It has been consistently noted that inaction by the Legislature is a "weak reed upon which to lean" and a "poor beacon" on which to rely. 2A Sutherland, Statutory Construction § 49.10 at 407 (4th ed. 1984). See White v. Township of North Bergen, 77 N.J. 538, 555-556, 391 A.2d 911 (1978); Garden State Farms, Inc. v. Mayor Louis Bay, II, 77 N.J. 439, 453, 390 A.2d 1177 (1978).
However, we do find persuasive, and agree with, the rule referred to in J. Appleman, 16A Insurance Law and Practice § 8878.35 at 434 (1981):
The better rule is that implied in an insurance policy, is a promise by the insurer that it will exercise reasonable care in investigating a claim by the insured. A *490 negligent delay in failing to investigate leading to further property damage will create liability.
We conclude that first party recovery in tort may be appropriate where an insurer has breached its duty of fair dealing. Under the circumstances of this case the trial judge correctly submitted to the jury the issue of liability of the defendants. As noted, there was no dispute as to coverage or the amount due. Notwithstanding this, Pickett did not receive payment on his claim until September 1987, while the insurer knew of it on January 14, 1987, yet did not approve issuance of a proof of loss form until March. As such, the jury could well have concluded that Lloyds' actions constituted a breach of the duty of fair dealing implied in all contracts. See Onderdonk v. Presbyterian Homes of New Jersey, 85 N.J. 171, 182, 425 A.2d 1057 (1981); Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc., supra, 69 N.J. at 129-130, 351 A.2d 349. See also Noye v. Hoffmann-LaRoche, Inc., supra, 238 N.J. Super. at 436, 570 A.2d 12. The jury's verdict is supported by sufficient credible evidence in the record.

B.
Even viewed as a contract cause of action Pickett would have established entitlement to the damages awarded. In Donovan v. Bachstadt, 91 N.J. 434, 444-445, 453 A.2d 160 (1982), the Court stated:
`Compensatory damages are designed "to put the injured party in as good a position as he would have had if performance had been rendered as promised." 5 Corbin, Contracts § 992, p. 5 (1951).' [Footnote omitted]. 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 [168 A.2d 33] (1961); see also Giumarra v. Harrington Heights, Inc., 33 N.J. Super. 178, 196, 109 A.2d 695 (App.Div. 1954), aff'd o.b., 18 N.J. 548 [114 A.2d 720] (1955); E. Farnsworth, Contracts 839 (1982). What that position is depends upon what the parties reasonably expected. It follows that the defendant is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made.
Moreover, in Perth Amboy Iron Works, Inc. v. American Homes Assurance Company, 226 N.J. Super. 200, 224, 543 A.2d 1020 (App.Div. 1988), affirmed o.b., 118 N.J. 249, 571 A.2d *491 294 (1990), we concluded that lost profits established to a "reasonable degree of certainty" may be recoverable as consequential damages in an action for breach of contract.
Hence, alternatively, we consider the damages awarded here to have been reasonably foreseeable at the time the policy was issued, and thus recoverable in an action for breach of contract. Here, the insurer knew it was insuring a commercial tractor used by Pickett. Although the insurance application is not part of the record, the policy form issued on January 5, 1987 described the vehicle and its use as commercial. Thus, it was reasonably foreseeable to both parties at the time the contract was entered into that if the vehicle was totally destroyed the insured's livelihood and income would be affected.

II.
Defendants assert that Pickett should be barred from recovery because he did not sign and submit the proof of loss required by the insurance contract until after his seniority expired. They thus argue that the breach of the time limit to pay the claim was not the proximate cause of Pickett's loss.
The insurance policy's proof of loss provision required Pickett to submit a sworn proof of loss statement within 60 days. Lloyds had 60 days from receipt of the proof of loss to pay the claim. Nothing in the policy states who is to provide or prepare a proof of loss form statement.[6] However, it is significant to note that according to Pavlik, Lloyds did not approve issuance of the proof of loss statement to an adjuster until March 25, *492 1987 and at that time requested a copy of Michigan Claims' final report.[7] According to Pavlik's testimony, this document then had to be signed by the insured and sent back to Lloyds. This is so despite the fact that Lloyds had received the claim information by fax on January 19, 1987.
Lloyds and Peerless contend that nothing imposed any duty on them to provide a proof of loss form immediately when a loss is reported, or at any time shortly thereafter. Although no testimony of industry custom and practice was presented, the trial judge answered this argument in the following language when he denied defendants' motion to dismiss. "People like Mr. Pickett don't walk around with Proof of Loss claims in their back pocket, but it is in the contract that Mr. Pickett had an obligation to file that form within 60 days." The judge apparently considered this as part of the issue of negligence.
In any event, ambiguous or doubtful provisions of an insurance contract are generally construed in favor of the insured. Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 35-36, 548 A.2d 188 (1988); Sparks v. St. Paul Insurance Co., 100 N.J. 325, 336, 495 A.2d 406 (1985); Mancuso v. Rothberg, 67 N.J. Super. 248, 170 A.2d 482 (App.Div. 1961). And, when the insurer is the cause of the delay a waiver of a timely proof of loss request has been inferred. Gray v. Blum, 55 N.J. Eq. 553, 38 A. 646 (E. & A. 1897); see also J. Appleman, 17A Insurance Law and Practice §§ 9804, 9805 at 388-395 (1981).
Much of the delay occurred when Lloyds provided Peerless with the name and address of a claims adjuster who could not be located. Moreover, when Michigan Claims was selected as the adjustment firm, it was provided insufficient information *493 to efficiently investigate the claim as solely a property damage claim. About a month passed between the time when Lloyds "approved the proof of loss to be issued" and Pickett received the form. Here, the jury could well have concluded that there was an absence of fair dealing, that defendants were negligent in not providing the proof of loss form within a reasonable time, and that this negligence proximately caused the loss of Pickett's seniority. There is sufficient credible evidence in the record to support the jury's determination.
We reject defendants' argument that it was error for the judge to submit the question of whether Pickett was bound by the release to the jury in light of Pickett's testimony that he did not read the proof of loss or the release language. The judge's instructions to the jury on the issue of the reasonableness of Picket's actions with regard to the proof of loss which contained the release language and any ambiguities were proper. He advised the jury:
What the law does require of the plaintiff is that he act reasonably in light of the circumstances present and known to him at the time the document was signed. Therefore, Mr. Pickett was legally obligated to make such examination of the document in question as would be reasonable under the circumstances as they were known and understood by Mr. Pickett on April 20, 1987, the day that he signed the document. If you find that Mr. Pickett reasonably believed that he had no choice but to sign the document in order to obtain the settlement proceeds, then you may conclude that Mr. Pickett acted reasonably, even though he failed to carefully read the document prior to signing it. In any event, the fact that the plaintiff didn't read that portion of the document that Lloyds  Lloyds relies on, in and of itself, does not resolve the issue before you. As I indicated earlier, the general rule is that a person is bound by an instrument he signs unless relieved by, quote, `other circumstances,' unquote. Our cases acknowledge that it is a difficult task to clearly define the other circumstances which may serve as legal justification to negate the enforcement of a signed written agreement. In this case you are being asked to determine the scope, as well as the overall validity and enforceability of a document given by an insured, Mr. Pickett, to an insurer, Lloyds of London. Therefore, you are instructed that the fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties. Furthermore, you are instructed that any ambiguities in documents drafted by insurance companies are to be resolved against the insurance companies. Once again, the existence or nonexistence of an ambiguity in the document signed by Mr. Pickett is for you to decide.
*494 The fact that an insured has signed a document required to be obtained from him by the insurer is not conclusive evidence that the agent properly fulfilled its duty. Dancy v. Popp, 232 N.J. Super. 1, 4-5, 556 A.2d 331 (App.Div. 1988), affirmed 114 N.J. 570, 572, 556 A.2d 312 (1989). Here, the release provision was in a document that Pickett was contractually bound to execute in order to obtain payment for an undisputed claim.[8] He had to sign it before he would receive payment of the insurance proceeds. If he had refused to sign it he would likely not have been paid. There was no simultaneous "closing" in which the document was exchanged for payment. The heading on the form did not suggest that payment of this undisputed claim constituted consideration for a release of any and all other claims, including one not covered by the policy and arising from a breach of contract or negligent handling of a claim. The release would not, and could not, cover unfair dealing by the insurer or its agent with the policy holder by an unduly delayed payment.[9] Again, there is no basis to disturb the jury's determination.

III.
Nor do we disturb the damage award. There was ample evidence from which the jury could have determined its award of damages. See Ackerman v. Kramer Chemical Company, 158 N.J. Super. 128, 130, 385 A.2d 898 (App.Div. 1978), certif. granted 77 N.J. 499, 391 A.2d 513 (1978), certif. dismissed *495 79 N.J. 463, 401 A.2d 219 (1978). The parties stipulated that Pickett averaged about $6,000 more in net income per year in the four years preceding the loss of his seniority status than in the three years following the accident. Pickett's 1986 gross income was $86,311. He testified that at the time of the accident he intended to work about four and one-half more years until he reached age 65. Thus, a conservative estimate of loss of income would be about $27,000. Pickett withdrew about $44,000 from his pension fund to meet business and living expense. He also testified that when taking into account business expenditures, his financial needs for the time his truck was damaged could be equated with his pre-accident gross income. The jury thus had a sufficient factual basis to underpin its award.
Affirmed.
NOTES
[1] Claims against Kast Associates were dismissed by the trial judge and that order is not the subject of any cross-appeal.
[2] Pavlik denied ever being informed there was any urgency to the claim, even after being confronted with documentary evidence.
[3] The bank had a lien on the tractor for approximately $25,000. Pickett received net proceeds of approximately $4,500.
[4] See the concurring opinion in Noye (238 N.J. Super. at 439, 570 A.2d 12.)
[5] N.J.S.A. 17:29B-4(9)(a)-(n) sets forth "unfair claim settlement practices." See particularly subsections (b), (d) and (e). The enumerated acts are neither exclusive nor intended to restrict the powers of the Commissioner of Insurance. N.J.S.A. 17:29B-4(11).

The Commissioner of Insurance's administrative regulations define unreasonable delay in N.J.A.C. 11:3-10.5 as follows:
(a) Unless a clear justification exists, physical damage claims will have a maximum payment period of 30 calendar days. A payment period is the period between the date of the receipt of the notice of loss by the insurer, and:
1. The date the settlement check is mailed; or
2. The date on which the damaged vehicle is returned to use when the insurer elects to repair or have repaired the insured vehicle; or
3. The date on which the damaged vehicle is replaced by the insurer.
(b) If any element of a physical damage claim remains unresolved more than 30 calendar days from the date of receipt of notice of loss by the insurer, the insurer shall provide the insured with a written explanation of the specific reasons for delay in the claim settlement. An updated letter of explanation shall be sent again every 30 calendar days thereafter until all elements of claim are either honored or rejected. * * *
[6] The record does not reflect whether the insurer requires that its own proof of loss form be submitted or whether it would accept a sworn proof of loss statement in a form prepared by the assured. The procedure outlined by Pavlik seems to place control of the form in Lloyds and its adjuster. We would expect that most commonly the insurer provides or requires its own form be utilized (as the content of the form used here makes obvious) and that the insurer or its agent would readily make the claim form available when a loss is reported as a claim under a policy.
[7] The insurance policy also states "in the event of any loss or damage covered hereunder, the Assured shall give the Underwriters a reasonable time and opportunity to examine the insured automobile before any repairs are begun or any physical evidence of damage removed."
[8] As noted earlier, the document was entitled: "Proof of Loss, Subrogation Agreement and Authorization to Pay Accounts."
[9] Issues of the scope, overall validity and enforceability of the release are essentially questions of law for the judge. Even if it was error to submit the issue of the applicability of the release to the jury as to claims by Pickett for damage due to the manner of handling of his claim, this was harmless error. As a matter of law the release was inapplicable to the type of damages which were the subject of the lawsuit. Moreover, it is doubtful that there could be found any consideration for the release with reference to the damages sought.