791 A.2d 1068 (2002)
348 N.J. Super. 243
Richard SEIDENBERG and Eric Raymond, Plaintiffs-Appellants,
v.
SUMMIT BANK, Corporate Dynamics and Philadelphia Benefits Corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 2001.
Decided February 28, 2002.
*1071 Steven E. Angstreich, Philadelphia, PA, argued the cause for appellants (Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, attorneys; Mr. Angstreich, on the brief).
John J. Murphy, III, argued the cause for respondents (Stradley, Ronon, Stevens & Young, attorneys, Cherry Hill; Mr. Murphy and Stephen B. Nolan, Newark, on the brief).
Before Judges KING, WINKELSTEIN and CLARKSON S. FISHER, Jr. *1069
*1070 The opinion of the court was delivered by CLARKSON S. FISHER, Jr., J.S.C. (temporarily assigned).
After settling all their disputes concerning the express terms of their commercial transaction, plaintiffs filed a second amended complaint alleging a breach of the implied covenant of good faith and fair dealing. The Law Division dismissed the action, finding that plaintiffs failed to state a claim upon which relief may be granted. Because we conclude the assessment of the validity of the claim was both erroneous and premature, we reverse.

*1072 I
Plaintiffs' second amended complaint was dismissed pursuant to R. 4:6-2(e) for failure to state a claim upon which relief may be granted. The invocation of that rule requires an assumption that the allegations of the pleading are true and affords the pleader all reasonable factual inferences. Independent Dairy Workers Union v. Milk Drivers Local 680, 23 N.J. 85, 89, 127 A.2d 869 (1956). This requires that the pleading be searched in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). Because R. 4:6-2(e) requires that the pleading be generously examined and that all matters outside the pleadings be excluded, the motion is granted only in rare instances. See F.G. v. MacDonell, 150 N.J. 550, 556, 696 A.2d 697 (1997). Indeed, when the legal basis for the claim emanates from a new or evolving legal doctrine, even greater hesitancy is warranted. Appellate review of an order dismissing an action on this basis is governed by a standard no different than that applied by the trial courts. Accordingly, we base our review of the order in question in light of the facts pleaded by plaintiffs and the reasonable inferences that may be drawn therefrom.

II
Plaintiffs Richard Seidenberg and Eric Raymond formed two Pennsylvania corporationsCorporate Dynamics and Philadelphia Benefits Corporationin 1971 and 1985, respectively. These entities marketed, provided consultation services and sold health insurance benefit plans to employers. Plaintiffs were the sole shareholders of the two entities.
In 1997, plaintiffs sold their stock in Corporate Dynamics and Philadelphia Benefits Corporation (hereafter collectively referred to as "the brokerage firms") to defendant Summit Bank ("Summit") in exchange for 445,000 shares of the common stock of Bancorp Corporation, Summit's parent corporation[1]; in addition, plaintiffs agreed to place 49,500 shares of Bancorp Corporation into escrow until December 12, 2001 as security for any existing but unknown or undisclosed liabilities. As part of the transaction, plaintiffs retained their positions as executives of the brokerage firms and also were to be placed in charge of the daily operations of any other employee benefits insurance business which might be acquired by Summit.
Plaintiffs' employment agreements with Summit acknowledged the parties' joint obligation to work together with respect to the future performance of the brokerage firms:
Summit and [plaintiffs] shall work together to formulate joint marketing programs which will give [the brokerage firms] access to the market resources of Summit to the extent permitted by applicable laws, regulations and administrative policies and guidelines, including but not limited to those relating to customer privacy, issued by Federal or state regulatory authorities or agencies or self-regulatory organizations or financial industry trade groups. In the second amended complaint, plaintiffs contend, among other things, that Summit (a) failed to allow for the creation of a close working relationship between the entities, (b) failed to create an effective cross-selling structure to generate leads, (c) failed to introduce the brokerage firms to vendors doing business with Summit as a way of increasing their potential customer base, (d) failed to develop existing relationships (referred to in the pleadings as "low hanging fruit") which could easily be *1073 picked and turned into clients for the brokerage firms, (e) failed to provide plaintiffs with information necessary to provide full advice concerning health and other employee benefits, thereby precluding plaintiffs from quoting coverage to Summit, (f) unreasonably delayed a direct mail campaign, (g) thwarted an agreed-upon joint marketing campaign, and (h) failed to advise of Summit's pursuit of the acquisition of another entity which plaintiffs claim would fall within their ambit and right to operate.
Plaintiffs claimed that Summit's lack of performance in these areas impacted their reasonable expectations of compensation and future involvement. For example, plaintiffs' salaries were reduced in exchange for a bonus to which they would be entitled based on the growth of the brokerage firms. They claim this was agreeable due to the anticipation of a substantial bonus upon the growth of the business. Accordingly, the allegations contained in the second amended complaint, briefly outlined above, are linked to plaintiffs' compensation. In addition, plaintiffs claim there was an expectation of continued employment since their employment agreements contained a minimum term of five years and provided also that, in the absence of termination by Summit, employment would continue until each reached the age of 70.
Plaintiffs assert that these allegations give rise to an inference of bad faith. They claim that these circumstances demonstrate that Summit "never had any intention to perform to begin with," and that Summit "from the start, ... never [was] committed to developing the business with [plaintiffs], but rather simply wanted to acquire the business and seek out their own broker to run it or grow it." In December 1999, Summit terminated plaintiffs from their positions, triggering this lawsuit.

III
On February 10, 2000, plaintiffs filed a complaint in the Chancery Division. After the joinder of issue, the parties reached a partial settlement of their disputes and, on July 25, 2000, a consent order was entered which eliminated all claims except plaintiffs' claim of a breach of the implied covenant of good faith and fair dealing. With the resolution of the equity claims, the Chancery judge, as was his prerogative, transferred the matter to the Law Division. On August 16, 2000, plaintiffs filed a second amended complaint and defendants quickly filed a motion to dismiss for failure to state a claim upon which relief may be granted, pursuant to R. 4:6-2(e).[2]
The motion was granted. In essence, the Law Division judge held that plaintiffs were not claiming a breach of the implied covenant of good faith and fair dealing but were seeking to prove the existence (and obtain enforcement) of an oral agreement allegedly made beyond the four corners of the written agreements in violation of the parol evidence rule:
I am satisfied that the facts as pled do not allege as a matter of law and cannot allege as a matter of law a breach of the covenant of good faith and fair dealing. Because in fact what the complaint is alleging is that there were agreements made orally outside of the written agreements *1074 that the bank would do certain things. And, that because the bank didn't do certain things, the plaintiffs were deprived of certain income.
The ruling under review also placed emphasis on the bargaining power of the parties:
We are not dealing with unsophisticated people. [Plaintiffs], from the record it would appear, are very sophisticated businessmen, developed very successful businesses. And, with the assistance of very able counsel entered into certain contracts with the bank that set out the framework for the way they would act as president and vice-president of [the brokerage firms].... [They] leaned back in reliance on things that were said to them during the course of the negotiations by the people from the bank, then they certainly had the opportunity to have those representations and considerations put into the written agreement and they weren't donethat just simply wasn't done.
Based upon these observations as to the meaning of plaintiffs' allegations, the motion to dismiss was granted. We find the Law Division judge's conclusions misapprehend the nature of the cause of action and represent an erroneous interpretation of the evolving implied covenant of good faith and fair dealing.

IV
We start with the premise that in New Jersey the covenant of good faith and fair dealing is contained in all contracts and mandates that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420, 690 A.2d 575 (1997); Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). While this general statement represents the guiding principle in such matters determining whether the present action may be maintained requires closer examination.
The implied covenant of good faith and fair dealing has evolved to the point where it permits the adjustment of the obligations of contracting parties in a number of different ways. Some cases have focused on a plaintiff's inadequate bargaining power or financial vulnerability in order to avoid an inequitable result otherwise permitted by a contract's express terms. See e.g., Sons of Thunder. Other decisions have revolved around the expectations of the parties, generating a need to contrast those expectations with the absence of any express terms. See e.g., Onderdonk v. Presbyterian Homes, 85 N.J. 171, 425 A.2d 1057 (1981). And still others have emphasized the defendant's bad faith or outright dishonesty. See e.g., Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993). Yet, as the implied covenant of good faith and fair dealing continues to develop, and in light of the covenant's essential factors as discerned from the existing case law, we cannot say, in examining the unadorned record in this case, that an actionable claim cannot be found in plaintiffs' allegations.
In granting defendant's motion to dismiss, we understand the Law Division to have relied on two points: the parties' equal strength at the time the contract was formed and plaintiffs' assertion of oral discussions unreflected by the written contract. We find erroneous both the undue emphasis placed on the absence of plaintiffs' financial vulnerability and the misperceived importance of the parol evidence rule, particularly when viewed at the pleading stage.

A
Sons of Thunderoften viewed as a watershed event in the course of the implied covenant of good faith and fair dealing-is, *1075 perhaps, the best example of how a plaintiff's unequal bargaining power will bring the implied covenant to the forefront even if defendant acted in conformity with the express terms of the contract. In the wake of Sons of Thunder, it certainly would have been fair to conclude that bargaining power is a critical aspect of any application of the implied covenant to a contractual dispute.
In Sons of Thunder, the Court emphasized the parties' unequal bargaining power as one factor in finding a breach of the implied covenant of good faith and fair dealing. Sons of Thunder involved an operator of a vessel which contracted to supply clams to Borden. Even though the contract's term was for one year and was also terminable on 90 days' notice, the Court found that Borden could still be found to have violated the implied covenant because it had preyed on Sons of Thunder's lack of sophistication and desperate financial straits. The Court stressed the importance of protecting and vindicating plaintiff's expectations particularly in light of the significant investments made by Sons of Thunder in anticipation of Borden's good faith performance. The Court also emphasized this feature in the earlier case of Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 130, 351 A.2d 349 (1976). That these two seminal cases in the growth of the implied covenant stressed economic dependency and financial strength understandably suggests the importance of this factor. Nevertheless, while disparate strength may sometimes be a prominent feature, it is not the sine qua non of such a cause of action. It is merely one factor among many to be considered. Accord, Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 173 (3d Cir.2001).
In this case, it is undisputed that the parties are all sophisticated and financially strong; it appears undisputed that plaintiffs possessed sufficient bargaining power during the formation of their agreement with Summit. According to their own contentions, plaintiffs have been in the insurance industry for several years and built two very successful brokerage firms. Furthermore, the record reflects that both parties were assisted by able counsel in negotiating their agreement. But equal bargaining power and the advice of competent counsel at the formation of the contract are not determinative. Rather, we conclude that while the bargaining power and sophistication of the parties must be viewed as significant, and should be considered in the analysis of any such dispute, it is not the sole criterion by which this claim must be resolved.

B
We also discern from her oral opinion that the Law Division judge believed plaintiffs would be unable to substantiate their claim because, in reality, they seek to prove some oral agreement dehors the written contract.[3] In short, the Law Division judge appears to have found the parol evidence rule an insurmountable obstacle to plaintiffs' claim. We find this erroneous.
The parol evidence rule prohibits the introduction of oral promises which tend to alter or vary an integrated written instrument. Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J.Super. 369, 378, 164 A.2d 607 (App.Div.1960). According to Professor Williston, "[t]he general rule is clear that a parol agreement which is in terms contradictory of the express words of a contemporaneous or subsequent written *1076 contract, properly interpreted, necessarily is ineffectual and evidence of it inadmissible." 4 Williston on Contracts § 639 (Jaeger ed.1961). See also, Winoka Village v. Tate, 16 N.J.Super. 330, 333, 84 A.2d 626 (App.Div.1951). Parol evidence may, however, be admitted in order to provide understanding into the parties' intentions. Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J.Super. 485, 496, 189 A.2d 448 (App.Div.), certif. denied, 40 N.J. 226, 191 A.2d 63 (1963).
Put in the present context, it must first be observed that the parol evidence rule does not even come into play "until it is first determined what the true agreement of the parties is." Ibid. Accordingly, the rule cannot inhibit the application of the implied covenant of good faith and fair dealing because that covenant is contained in all contracts made in New Jersey by operation of law. Sons of Thunder, 148 N.J. at 420, 690 A.2d 575. Moreover, the central premise of the implied covenant is the enhanced status of the parties' reasonable expectations. If the parol evidence rule is vigorously applied in such situations, the opportunity to pursue such a claim would be extremely limited. The manner in which our courts have defined the scope of the covenant demonstrates the fallacy of such a broad application of the parol evidence rule.
The implied covenant of good faith and fair dealing has been applied in three general ways, each largely unaffected by the parol evidence rule. First, the covenant permits the inclusion of terms and conditions which have not been expressly set forth in the written contract. The earlier cases, such as Bak-A-Lum, 69 N.J. at 129-30, 351 A.2d 349, and Onderdonk, 85 N.J. 171, 425 A.2d 1057, provide examples of the imposition of absent terms and conditions. The covenant acts in such instances to include terms "the parties must have intended ... because they are necessary to give business efficacy" to the contract. New Jersey Bank v. Palladino, 77 N.J. 33, 46, 389 A.2d 454 (1978); see also M.J. Paquet, Inc. v. N.J. Dept. of Transp., 335 N.J.Super. 130, 141-42, 761 A.2d 122 (App.Div.2000), certif. granted, 167 N.J. 635, 772 A.2d 937 (2001). Second, the covenant has been utilized to allow redress for the bad faith performance of an agreement even when the defendant has not breached any express term, as in Sons of Thunder. And third, the covenant has been held, in more recent cases, to permit inquiry into a party's exercise of discretion expressly granted by a contract's terms. See Wilson v. Amerada Hess Corporation, 168 N.J. 236, 250, 773 A.2d 1121 (2001); R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co., 168 N.J. 255, 281, 773 A.2d 1132 (2001); Emerson Radio, 253 F.3d at 170-72.
The second aspect, exemplified by Sons of Thunder, and the third, represented by cases such as Wilson, are implicated in this case. In both these situations, the parol evidence rule has a potential for coming into play. For, while the implied covenant has gone far in altering the way in which contractual performance will be weighed, our Supreme Court has consistently held that the "implied covenant of good faith and fair dealing cannot override an express term in a contract." Wilson, 168 N.J. at 244, 773 A.2d 1121; Sons of Thunder, 148 N.J. at 419, 690 A.2d 575. But, instead of altering or overriding an express term, the implied covenant requires that a contracting party act in good faith when exercising either discretion in performing its contractual obligations, see Wilson, 168 N.J. at 245, 773 A.2d 1121; R.J. Gaydos, 168 N.J. at 281, 773 A.2d 1132; Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir.1992), or its right to terminate, see Bak-A-Lum, 69 N.J. at 129-30, 351 A.2d 349. Accordingly, *1077 it may occur that a party will be found to have breached the implied covenant even if the action complained of does not violate a "pertinent express term." Wilson, 168 N.J. at 244, 773 A.2d 1121. By staying within those parameters, the implied covenantwhile necessarily "vague and amorphous," as Judge Greenberg observed in Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir.2000)remains faithful to the purposes of the parol evidence rule.
Accordingly, it can readily be seen that the parol evidence rule appears to have no present application in the case at hand. By concluding that plaintiffs seek to prove an oral agreement outside the bounds of a fully integrated written contract, the Law Division judge misapprehended the scope of the implied covenant of good faith and fair dealing and overly-expanded the importance of the parol evidence rule. The parol evidence rule is not impacted because the obligation to act with good faith and fair dealing is, by its very nature, "implied." The prohibition on parol evidence to alter or vary a written contract relates, in the present context, only to the creation of the contract. Because the covenant of good faith and fair dealing is implied by operation of law, the view that the parol evidence rule somehow inhibits plaintiffs' claim is erroneous. And, because plaintiffs do not seek to contradict or alter any express term in their written contract, but rather question Summit's bona fides in both its performance and termination of the contract, there presently appears to be no concern that the particular manner in which plaintiffs would have the implied covenant applied would run afoul of the parol evidence rule.
To determine what is considered a good faith performance, the court must consider the expectations of the parties and the purposes for which the contract was made. It would be difficult, if not impossible, to make that determination without considering evidence outside the written memorialization of the parties' agreement. Therefore, in determining whether a breach of the covenant has occurred, a court must allow for parol evidence and the Law Division's determination that the need for parol evidence is fatal to the second amended complaint is erroneous.

C
The guiding principle in the application of the implied covenant of good faith and fair dealing emanates from the fundamental notion that a party to a contract may not unreasonably frustrate its purpose:
[W]here a party alleges frustration of its expectation or fundamental purpose in entering the contract, the question of what interest will be protected by the implied duty answers itself; the plaintiff's interest is internal to the understanding of the parties and good faith requires the defendant not exercise such discretion as it may have under the literal terms of the contract to thwart plaintiff's expectation or purpose.
[Emerson Radio Corp. v. Orion Sales Inc., 80 F.Supp.2d 307, 314 (D.N.J. 2000), rev'd in part on other grounds, 253 F.3d 159 (3d Cir.2001), cited with approval in Wilson, 168 N.J. at 250, 773 A.2d 1121.]
See also, Sons of Thunder, 148 N.J. at 425, 690 A.2d 575 (the implied covenant was breached because defendant's conduct "destroyed Sons of Thunder's reasonable expectations and right to receive the fruits of the contract"); Restatement (Second) of Contracts, § 205, comment a (1979) ("Good faith performance ... emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").
*1078 As discussed earlier, the application of the implied covenant of good faith and fair dealing has addressed three distinct type of situations: (1) when the contract does not provide a term necessary to fulfill the parties' expectations, see e.g., Onderdonk, 85 N.J. at 182, 425 A.2d 1057; (2) when bad faith served as a pretext for the exercise of a contractual right to terminate, see e.g., Bak-A-Lum, 69 N.J. at 130, 351 A.2d 349; and (3) when the contract expressly provides a party with discretion regarding its performance, see e.g., Wilson, 168 N.J. 236, 773 A.2d 1121. This third aspect, fully examined in Wilson, can take at least two different forms:
[A] contract ... would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated rangea reason beyond the risks assumed by the party claiming the breach [or the contract would be breached] if the discretion-exercising party ... unilaterally use[s] that authority in a way that intentionally subjects the other party to a risk beyond the normal business risks that the parties could have contemplated at the time of contract formation.
[168 N.J. at 246, 773 A.2d 1121, quoting with approval Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv. L.Rev. 369, 386 (1980).] Here, plaintiffs appear to urge an application of both the second and third facets of the implied covenant. The Law Division judge's decision to dismiss the second amended complaint constituted a mistaken understanding of the covenant in these areas.
Faced with a motion to dismiss pursuant to R. 4:6-2(e), the court below was required to determine only whether the second amended complaint sufficiently outlined a cause of action consistent with any of these categories. In this case, the second amended complaint alleges circumstances which, if proven, might support a claim based upon Summit's termination of their relationship. To some extent, plaintiffs alleged there was an expectation despite the express contractual right of Summit to terminatethat the relationship would last until they reached retirement age. This contention would, on its face, fall within that type of implied covenant claim prohibiting a party from terminating a contractual relationship in bad faith notwithstanding the expressed right to do so.
The second amended complaint also alleges that Summit used insufficient energy in discretionary areas. That is, plaintiffs allege that Summit failed to pursue or create leads, frustrated or delayed marketing efforts, and deprived plaintiffs of information which might improve their benefits under the contract, thus sufficiently alleging a cause of action under the discretionary tranche of the multi-faceted implied covenant of good faith and fair dealing.

D
The last element of a maintainable cause of action based upon the implied covenant of good faith and fair dealing is bad faith or ill motive. Courts have described this element in various ways. Most importantly, our Supreme Court has recently emphasized the level of bad faith and improper motive which will be required in a party's exercise of the discretion permitted by the contract:
[A] party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract.

*1079 ... In that setting, an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive. Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.
[Wilson, 168 N.J. at 251, 773 A.2d 1121 (citations omitted).]
While Wilson's description of good faith relates to price setting, we fail to see why it would not be similarly applied in examining the type of performance (or lack thereof) as alleged by plaintiffs.
Before finding a breach of the implied covenant, care must be taken that the bad faith element is fully realized. Recognizing a concern for an overly ambitious application of the implied covenant, the Court in Wilsonin defining the level of bad faith required in such matters charted a careful course between implying a promise to avoid an apparent unjust result and requiring parties to adhere to the bargain they freely and voluntarily made. Referencing one federal court of appeal's holdings that the covenant is not intended to supplant the prohibition on judicial rewriting of contracts or provide undue protection to contracting parties who can protect themselves,[4] the Wilson decision represents an increased emphasis on the importance of this factor:
[A]n allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive.
Because the implied covenant of good faith and fair dealing applies to the parties' performance under the contract notwithstanding [a] provision in the contract permitting [the exercise of discretion in setting prices] ... the issue is whether ... [the defendant] acted in bad faith or violated any commercially reasonable standard thereby depriving plaintiffs of their right to make a reasonable profit.
[168 N.J. at 251, 253, 773 A.2d 1121.]
Providing a more precise definition of bad faith in the context of this, or any other similar case, is unrealistic. See e.g., Wade v. Kessler Institute, 343 N.J.Super. 338, 346-48, 778 A.2d 580 (App.Div. 2001). We recognize that expressions such as "bad faith," "improper motive," and other similar words and phrases used to describe this requisite state of mind provide little guidance. While the particular defining words chosen will inherently be of "little assistance to the trial judge who must distinguish bad faith from mere sharp commercial practice," Emerson Radio, 80 F.Supp.2d at 311, it is best to entrust the drawing of such a line to trial judges and juries with the admonition that an unduly expansive version of bad faith, as Judge Greenberg cautioned in Northview Motors, "could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." 227 F.3d at 92. In the final analysis, bad faith must be judged not only in light of the proofs regarding the defendant's state of mind but also in the context from which the claim arose. The Court in Wilson coupled the element *1080 of bad faith with a requirement that the plaintiff demonstrate a violation of "any commercially reasonable standard." 168 N.J. at 253, 773 A.2d 1121. Accordingly, this element may be determined, at least in part, by the nature of the parties' undertaking and the standards applicable to the business or industry in which they have engaged. Ultimately, however, the presence of bad faith is to be found in the eye of the beholder or, more to the point, in the eye of the trier of fact. Any attempt to provide greater definition is to expect some "delusive exactness" which, as Justice Holmes said, is "a source of fallacy throughout the law." Truax v. Corrigan, 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254, 267 (1921) (dissenting opinion).
Even though the order of dismissal was not based upon some insufficiency in regard to its allegations of bad faith, we lastly pause, in providing guidance for future proceedings in this case, to observe that the second amended complaint was adequate in this regard, alleging that plaintiffs "suffered as a result of ... Summit's bad faith" and that Summit's actions were "wanton and willful and without privilege or right." Whether plaintiffs' proofs will meet the bad faith standard defined in Wilson, or even survive summary judgment, remains to be seen. This question, however, certainly cannot be resolved until the parties are at least given a full and fair opportunity for further investigation and discovery.

V
To summarize, plaintiffs' claim of a breach of the implied covenant of good faith and fair dealing is not precluded merely because the parties' possessed equal bargaining power, or because plaintiffs were not financially vulnerable during the contract's formation, or even if the plaintiffs negotiated the contract with the assistance of highly competent counsel. These are factors which the trier of fact may consider in weighing the sufficiency of plaintiffs' claim but they are not the only factors. Also, we conclude that the parol evidence rule presently appears to have no impact upon the ability of plaintiffs to substantiate either their claim that they had a reasonable expectation of a continued relationship (notwithstanding the expressed right of Summit to terminate), or their claim that Summit failed to perform its contractual obligations in good faith. And lastly, while the appropriate level of bad faith may be difficult to define and may also vary depending upon the nature of the alleged breach and the type of business engaged in by the parties, we find plaintiffs' allegations of bad faith and ill motives are sufficient to survive dismissal.
In viewing the pleadings with liberality, as required at the present stage, see Printing Mart-Morristown, 116 N.J. at 746, 563 A.2d 31, we are satisfied that the Law Division erred in granting the motion to dismiss. All the elements of such a cause of action are contained within the second amended complaint. Whether those allegations can be substantiated remains to be seen after the parties have been afforded a full and fair opportunity for further investigation and discovery.
The order of dismissal is reversed and the matter remanded for further proceedings in conformity herewith. We do not retain jurisdiction.
NOTES
[1] As of the date of closing, the stock had a value of $43.50 per share.
[2] Plaintiffs claim that the time of the motion to dismiss was inappropriate, believing the parties had agreed that Summit would first file an answer before filing such a motion. We see no evidence of such an agreement in the July 25, 2000 consent order and, more over, find no significance to any alleged breach of such a stipulation. In other words, we find no harm caused by the filing of the motion to dismiss before, rather than after, the filing of an answer.
[3] The Law Division judge said: "Because in fact what the complaint is alleging is that there were agreements made orally outside of the written agreements that the bank would do certain things."
[4] "Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper." Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir. 1992) (quoted with approval in Wilson, 168 N.J. at 251-52, 773 A.2d 1121). See also, Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990) (the covenant of good faith and fair dealing "does not imply a general duty of `kindness' in performance").