**TRIONIC ASSOCIATES, INC., Plaintiff,**

v.

**HARRIS CORPORATION, Parallax Sales, Inc. and Donald Ciardi, Defendants.**

**No. CV 97–1828(RJD).**

United States District Court,
E.D. New York.

Nov. 25, 1998.

Charles E. Reuther, Kral, Clerkin, Redmond, Ryan, Perry & Girvan, Morristown, NJ, for Plaintiff.

Kathryn D. Kirmayer, Crowell & Moring, Washington, DC, Steven E. Garry, Costello, Shea & Gaffney, New York City, for Defendants.

### MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiff, Trionic Associates Inc. ("Trionic"), brings this breach of contract action against its former supplier, Harris Corporation ("Harris"), and former salesman, Donald Ciardi. Trionic also asserts claims against Parallax Sales, Inc. ("Parallax"), a competitor hired by Harris to replace Trionic. The defendants move for dismissal of Trionic's claims under Federal Rule of Civil Procedure 12(b)(6) or in the alternative, for summary judgment under Rule 56. Because the parties have submitted supporting affidavits, this motion will be treated as one for summary judgment.

### BACKGROUND

#### I. *Overview*

Harris is a Florida based manufacturer of semiconductors and integrated circuits. Harris sells its products in two ways. Harris has its own sales force that sells to manufacturers and to electronics distributors. These are called "in-house" accounts. Harris also contracts with outside companies, who act as Harris' sales representatives in a specific geographic region. These regional sales representatives are compensated through commissions.

A sales representative may become involved in the design of a new electronic product. A sales representative will often attempt to convince a manufacturer to incorporate a Harris semiconductor in design specifications. If the Harris part is ultimately "designed-in," the sales representative will reap commissions on the sales of the Harris part to the manufacturer once production begins. As part of the design process, the manufacturer may commission Harris to design a specialized "spec" semiconductor or circuit board for which the manufacturer would pay a one-time or "non recurring engineering expense" ("NRE").

There is no dispute that the process of designing a new electronic product may take months or years, and that the sales representative has no guarantee that the manufacturer will choose to use a Harris semiconductor in its new product, or even that it will proceed to production.

#### II. *The Sales Representative Relationship in 1994–1995.*

Trionic, a New York corporation, acted as a sales representative for Harris in New York and New Jersey from 1982 through November 1996. This relationship was formalized in successive sales representative agreements in 1986, 1989 and 1991. Trionic's

sales of Harris products grew from approximately $4 million in the early 1980's to $17 million in 1995. By 1995 sales of Harris' products accounted for 50% of Trionic's total sales.

On August 22, 1994, Harris and Trionic entered into the Sales Representative Agreement at issue in this case (the "Agreement"). This three-year Agreement required Trionic to "exercise its best efforts to promote the sales of [Harris] [p]roducts through contacting, soliciting purchases from and servicing customers (existing and prospective) throughout the Territory." Agreement § 9(a), entitled *Relationship*, states that Trionic is an independent contractor.

The Agreement contains two termination provisions. Either party may terminate the Agreement for convenience "at any time upon 30 days written notice to the other."[1] If Harris terminated the agreement for convenience, Trionic would earn full commissions on orders paid for during the notice period, and 80% commission on orders booked during the notice period and paid for during the next six months.

Harris could also terminate the Agreement for default if Trionic: "(i) [f]ails to perform any material obligation required by this Agreement; (ii)[m]akes an assignment for the benefit of creditors or a trustee in bankruptcy, or a receiver is appointed; (iii)[s]ubmits any false or fraudulent reports or statements concerning Harris or its [p]roducts to any [c]ustomer, the Government or to Harris; (iv)[v]iolates any applicable federal or state law. . . ." In the event of default, Harris was required to give Trionic written notification of the default and thirty days in which to cure the default. If Trionic failed to cure within the thirty days, the Agreement terminated and Trionic earned commission only on

those orders paid for during the notice period.

As part of the Agreement, Harris transferred two "in-house" accounts to Trionic, an AT & T account and an ITT Aerospace account. The AT & T account did not yet have any Harris products designed in. Despite this, Bruce Schwartz, Harris' Eastern Sales Director, told Trionic that projected revenues on the AT & T account were in the $8 million range.[2] Soon thereafter, Trionic learned that potential revenues from the AT & T account would be $4 million. The ITT account, however, already had several "design in's" in place, so that Trionic immediately began receiving commissions for related sales to ITT.

In November, 1994, Trionic learned from actual figures produced by Harris that the AT & T account had produced $1.2 million in yearly revenues. Also in November, Anthony Nolletti, one of Trionic's owners, made initial contact with AT & T about using Harris semiconductor chips in new products. Over the next year, Mr. Nolletti worked intensively to promote the use of Harris chips in emerging AT & T products.

According to Bruce Schwartz's testimony, as early as January 1995, he complained to Donald MacKenzie, a principal of Trionic, that Trionic was too thinly staffed and requested that Trionic add more personnel to the Harris account. MacKenzie agreed, but did not act. He admits that Trionic and Harris engaged in "continual discussions regarding Trionic's sales force and the allocation of . . . resources to Harris' business."

According to MacKenzie's testimony, "in the first full year after Trionic was given the AT & T and ITT accounts, its commissions . . . from both accounts was . . . $31,000 com-

---

**1.** The term "for convenience" is most often found in government contracts. It permits automatic termination by the government even when the contractor is not in default. *United States v. Digital Products Corp.*, 624 F.2d 690, 693 (5th Cir.1980). Florida's courts have upheld similar provisions which permit both of the contracting parties to terminate "for any reason whatsoever: on 30 days notice." *See Seaway Yacht Sales, Inc. v. Brunswick Corp.*, 242 So.2d 192 (Fla.App. 1970) (finding that it was "not necessary to construe [the term] . . . 'for any reason whatsoever' "

when there was "undisputed evidence as to both personality clashes and business problems.")

**2.** Harris contests this fact, claiming that no one at Harris made any representations about the potential profitability of the AT & T account, as it was impossible to know what that account would generate as there were no "design in's" in place at that time. (Schwartz Aff. 16). Rather they claim that Trionic assured *them* that they would make the AT & T account generate $8 million.

bined, which was in Trionic's judgment, a marginal amount in the [sic] terms of hiring a new employee." In addition, Harris never suggested to Trionic that failure to increase its staff would be grounds for terminating the Sales Agreement.

## III. *The AT & T Account*

On December 7, 1995, Anthony Nolletti's efforts appeared to be paying off. On that day, AT & T asked Harris to develop "spec" semiconductor chips for a newly designed product. AT & T paid Harris a "non recurring engineering expense" of $50,000. On December 19, 1995, AT & T paid a second NRE of $500,000.

In February, 1996, John Garrett, President of Harris Semiconductor, Ron Van Dell,[3] Bruce Schwartz and Tom Ryan[4] attended a meeting at AT & T which included high level AT & T employees involved in the development projects.

On August 8, 1996, Mr. Stoshack, a Harris employee, sent an e-mail to Bruce Schwartz and Anthony Nolletti, forecasting that potential revenues from the AT & T account would be $325,000 in 1997, from $6.5 million to $13 million in 1998, and up to $26 million in 1999. Mr. Stoshak noted that "[t]he forecast numbers are my best guess but the opportunity, like anything in the PC market, can be huge." According to Trionic, one of the spec semiconductors has become a standard Harris part, offered in Harris' catalogue at $14.95 per unit in quantities of 10,000 units. Although Trionic alleges that the "spec" semiconductors produced for AT & T "upon information and belief will develop ... into subsequent purchase orders for ... extensive sales of Harris products to AT & T and Lucent Technologies," Trionic has submitted no evidence of actual or impending sales.

On October 11, 1996, Trionic informed Harris that Mr. Nolletti was leaving the company for health reasons. According to MacKenzie, Harris insisted on interviewing Nolletti's replacement. However, Mr. MacKenzie insisted that he would personally

take over the AT & T account, promised that Trionic would hire another employee to take over Mr. Nolletti's other responsibilities. He informed Harris that Donald Ciardi, who sold Harris products to distributors, would work on direct sales as well. Trionic hired a Carlos Gullien, a recent college graduate with an engineering degree, to work on the Trionic account.

## IV. *Trionic Fired and Parallax Hired*

Bruce Schwartz and Tom Ryan testified that they doubted MacKenzie's sales abilities, felt that Donald Ciardi was already overburdened, and were skeptical of a new hire with no sales experience. Harris began looking for a new sales representative. After considering several companies, Harris contacted Parallax, in late October 1996.

Parallax had represented a Harris competitor, Maxim, but had lost that account when Maxim switched to in-house sales exclusively. Because Parallax had handled Maxim's integrated circuit sales, Schwartz and Ryan believed Parallax had the experience necessary to handle Harris' account. On November 1, Parallax and Harris met for the first time; and following a presentation a few days later by Parallax's owner and president, Robert DeStephano, Harris decided to hire Parallax.

On November 26, 1996, Ron Van Dell wrote a letter to MacKenzie, giving him formal notice that Harris was terminating the Agreement with Trionic for convenience. The official termination date was 30 days later, on December 27, 1996. Harris assured Trionic that it intended to meet its contractual obligations regarding any commissions due, as specified in the Agreement. It is undisputed that Harris has paid all commissions due.

On November 26th, Harris offered its product line to Parallax. Parallax promised to add a Distributor Sales Representative ("DSR"), an engineer, and an additional sales person to the Harris account. Parallax and Harris executed the Parallax Sales Representative Agreement on December 28, 1996.

---

**3.** Ron Van Dell is a Vice President–General Manager of marketing and sales at Harris.

**4.** Tom Ryan is Regional Sales Manager for Harris, responsible for promoting Harris' products in the Metro New York/Philadelphia region.

## V. *Donald Ciardi Hired*

When Ciardi started working at Trionic, he signed an agreement (the "Employment Agreement"). The Employment Agreement set forth his duties and salary, and included the following paragraph:

> The DSR during his term of employment, and for a period of two years after his separation from the Corporation for any reason whatsoever, shall not solicit the representation of, or represent or act as an employee of, any of the accounts of the Corporation within the Corporation's established territory.

According to Christopher Iannello, another Trionic principal, the purpose of this paragraph was "to protect Trionic's good will by limiting the ability of employees to pirate away accounts with which they became familiar [while at Trionic]." He also stated that the agreement is intended to "prevent an account from pirating a key employee of Trionic after Trionic ... has invested in the employee and placed him in a position of trust."

While at Trionic, Ciardi worked primarily on the Harris line of products. Ciardi acknowledged that he had developed his own sales strategies over his career as a salesman. He also testified that he was not privy to any unique or confidential "secrets" regarding Trionic's business or trade, such as secret business data or customer lists.

On November 26, 1996, Ciardi learned that Harris had decided to terminate Trionic. Because Harris was his primary account, he was concerned about his own job security. Ciardi spoke with several potential employers and had received job offers, before speaking with Parallax on December 12, 1996.

DeStephano testified that he began to consider Ciardi as a possible candidate after Parallax agreed to become Harris' representative on December 5, 1996. DeStephano had worked with Ciardi previously, and on December 12th, DeStephano went to a

Christmas party that he knew Ciardi would attend. At the party Ciardi accepted DeStephano's offer to come work for Parallax. Ciardi resigned from Trionic in the week after Christmas and was asked to leave immediately. Ciardi began work at Parallax on December 31, 1996. DeStephano was not aware of Ciardi's Employment Agreement with Trionic.

## DISCUSSION

### I. *Standard*

A motion for summary judgment should be granted only where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). In evaluating these motions, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

At the same time, however, the existence of a factual dispute alone is insufficient to defeat a motion for summary judgment; the non-moving party must offer affirmative evidence tending to support its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be entered against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II. *Trionic's Claims against Harris*[5]

Trionic asserts five claims against Harris: 1) breach of the Sales Representative Agreement; 2) breach of the implied covenant of good faith and fair dealing; 3) fraud; 4) breach of fiduciary duty; and 5) tortious

---

**5.** The Sales Representative Agreement specifies it is to be construed and enforced according to Florida law. Given that the no party has urged the application of another state's law as having more significant contacts with the matter, and because the law of Florida bears a reasonable relationship to the contract, the parties choice of law provision will be upheld. *Superior Funding Corp. v. Big Apple Capital Corp.*, 738 F.Supp. 1468 (S.D.N.Y.1990).

interference with the Employment Agreement between Trionic and Ciardi.[6]

### A. Breach of Contract: The Sales Representative Agreement

Trionic claims that the Agreement and "the course of dealing between the parties ... constituted a contract" that Harris breached "[b]y terminating the Sales Representative Agreement in November 1996." Trionic alleges that this "contract" obligated Harris to pay Trionic a commission for sales procured by Trionic, and that Trionic, as a result of the termination, was not paid a commission on purchase orders that Trionic alleges grew out of the orders for the "spec" semiconductors.

We take Trionic to be arguing that Harris' contractual right to terminate for convenience must be read in light of Harris' historical treatment of Trionic. In other words, because Harris had renewed its relationship with Trionic over the years, Trionic had a legitimate expectation that Harris would not terminate the relationship for convenience and frustrate Trionic's hopes for commissions on long term projects.

The Agreement expressly states that either party had the right to terminate the contract for convenience "at any time upon 30 days written notice." The Uniform Commercial Code commands that express contract terms and "an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other." U.C.C. § 1–205, Fla.Stat.Ann. § 671.205(4). In this case, however, no reasonable construction can reconcile the Agreement's express terms with the "course of conduct" Trionic suggests. The conflict could not be more complete. Harris' past conduct may arguably have created an expectation that Harris would not terminate the contract for convenience, yet the Agreement expressly gives Harris the right to do so. The express contract terms controls over any alleged conflicting usage or course of dealing. U.C.C. §§ 1–205, 2–208(2), Fla.Stat.Ann. §§ 671.205, 672.208. See Corenswet, Inc. v.

*Amana Refrigeration, Inc.*, 594 F.2d 129, 136 (5th Cir.1979) (the fact that Amana had not exercised the termination clause over seven years did not mean that a course of conduct had been created that overrode express contractual language that permitted termination "for any reason"). As Trionic has not otherwise alleged any breach of the express terms of the Agreement, it has failed to state a cause of action for breach of contract.

If given the opportunity, Trionic would amend its complaint to claim that Harris terminated Trionic *for cause* and breached the Agreement by not allowing Trionic to cure its deficiency. In support of this claim, Trionic points to the affidavits of Tom Ryan and Bruce Schwartz, which "attempt to establish and convince the court that Harris had good cause to terminate Trionic" for failing to dedicate sufficient manpower to the Harris account.

This is mere semantics. Harris did not act out of whim or impulse. Harris did have a good "cause" or a reason to terminate Trionic: a persistent difference of opinion over staffing and performance. There is no evidence, however, that Harris terminated Trionic for "default" as that term is precisely defined in the Agreement. The November 26, 1996, termination letter specifically notified Trionic that it was being terminated for convenience, and referred to the commissions due under the more favorable termination for convenience provisions. It is undisputed that Trionic was paid those commissions as required by the "convenience" provision in the Agreement.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

Trionic claims that Harris breached the implied covenant of good faith and fair dealing when it terminated Trionic. Florida recognizes the implied covenant of good faith and fair dealing, which "imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the

---

**6.** This claim will be discussed below along with the claim against Parallax for breach of the Employment Agreement with Ciardi.

contract presupposes they will do to accomplish its purpose." *Scheck v. Burger King*, 798 F.Supp. 692, 693–694 (S.D.Fla.1992) (quoting *Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895, 908 (8th Cir.1985)).

■ However, conduct which is expressly authorized by the contract cannot be said to breach the implied covenant. *Burger King Corp. v. C.R. Weaver and M–W–M, Inc.*, 798 F.Supp. 684 (S.D.Fla.1992); *Anthony Distributors, Inc. v. Miller Brewing Co.*, 941 F.Supp. 1567, 1574 (S.D.Fla.1996) ("The implied covenant of good faith and fair dealing is not actionable absent a breach of the contract's express terms."). In this case, Trionic has failed to allege a breach of the Agreement, as termination for convenience by either party is conduct expressly authorized by the Agreement.

Trionic seeks permission to amend its complaint to claim that Harris acted in bad faith by burdening Trionic with the AT & T and ITT accounts at a time that Harris secretly intended to terminate Trionic. In support of this theory, Trionic cites a New Jersey case, *Bak–A–Lum Corp. of America v. Alcoa Building Products, Inc.*, 69 N.J. 123, 351 A.2d 349 (N.J.1976). In *Bak–A–Lum*, a manufacturer encouraged its distributor to sign a five year lease on a warehouse, while secretly intending to terminate the distributor's exclusive contract and hire other distributors. The court held that the "defendant's selfish withholding from plaintiff of its intention to seriously impair its distributorship, although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith...." *Id.* at 129–130, 351 A.2d 349.

Trionic argues that Harris similarly acted in bad faith, assigning Trionic the AT & T and ITT accounts, knowing of the added costs Trionic would incur, at a time that Harris was contemplating terminating Trionic. The plaintiff's sole supporting evidence of this scheme is Bruce Schwartz's testimony that "in the one to two years prior to termi-

nation, Trionic's performance had begun to deteriorate." As evidence of costs incurred, Trionic points to the sales engineer hired in late 1996, as well as the resources expended to develop the AT & T account.

Assuming arguendo, that Florida courts would approve the rationale of *Bak–A–Lum*, the plaintiff has submitted no evidence that Harris secretly intended to terminate Trionic when it assigned the AT & T account. Schwartz testified that he had been concerned with Trionic's performance, not that he contemplated terminating Trionic. More significantly, this concern was not hidden from Trionic; according to Schwartz and MacKenzie there were on-going discussions about Trionic's failure to increase its staff to meet its responsibilities.

Because the underlying Agreement was not breached, Trionic's claim for a breach of the covenant of good faith and fair dealing is dismissed. Even if Trionic amended its pleading, it has failed to raise a material issue of fact that Harris was acting in bad faith when it assigned Trionic the AT & T account.

## C. *Fraud*[7]

■ Trionic alleges that it was fraudulently induced to accept the AT & T account. Specifically, Trionic claims the transfer of the AT & T account was an implicit promise by Harris that Trionic would "receive the benefits of its labor, efforts and resources expended upon that account."

It is well settled that a false promise can support a claim for fraud only where that promise was "collateral or extraneous" to the terms of an enforceable agreement in place between the two parties. *International Cabletel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483 (S.D.N.Y.1997); *see also Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986) (holding that a representation of present fact which was "the inducement for the contract" and which was

---

7. Under New York choice of law rules applicable to fraud, the law of the state in which the "injury was inflicted" applies. *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1150 (S.D.N.Y.1989). The alleged injury took place at Trionic's business, which is located in New York, therefore New York law governs.

"collateral to" that contract could support a claim for fraud); *D.S. America (East) v. Chromagrafx Imaging Systems,* 873 F.Supp. 786, 796 (E.D.N.Y.1995) ("a misrepresentation of present fact, not of future intent, collateral or extraneous to the contract, but which is an inducement to the contract, can give rise to a separate claim of fraudulent inducement").

■ Trionic has not adequately alleged a claim for fraudulent inducement. In the first instance, Harris' alleged misrepresentation, that Trionic would be allowed to reap the full benefits of its efforts on the AT & T account, is a statement of future intent, not present fact. Secondly, the transfer of the AT & T account was not collateral or extraneous to the Agreement, but was an integrated part of the Agreement.

■ If permitted to amend its complaint, Trionic would claim that it was induced to accept the AT & T account based on Bruce Schwartz's false statement that the AT & T business in the territory was worth $8 million. This claim would also fail, as there is no evidence that Schwartz's statement was one of present fact, relied on by Trionic to their detriment. The essential elements of fraud are: "representation of a existing fact, falsity, scienter, deception and injury." *New York University v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). Under New York law, for a party to be deceived it must have reasonably relied on the false statement. *Frutico v. Bankers Trust Co.,* 833 F.Supp. 288, 299–300 (S.D.N.Y.1993); *Lanzi v. Brooks,* 54 A.D.2d 1057, 388 N.Y.S.2d 946, 948 (1976).

Bruce Schwartz's statement that the *projected revenues* of the AT & T account were $8 million, is not a misrepresentation of present fact, but a projection of future possible revenues. Even if Schwartz assured Trionic that the AT & T account *had previously* brought in $8 million, Trionic could not show that it reasonably relied on this information when it invested its own resources in developing the account. Trionic claims that in

November 1994, it learned that the AT & T business had produced only $1.2 million in yearly revenues. However, Mr. Nolletti did not contact AT & T and began developing that account until November, 1994. There is no other evidence of actions or expenditures undertaken in reliance on Schwartz' "misrepresentation" that caused Trionic injury or loss.

### D. *Breach of Fiduciary Duty*[8]

■ Trionic claims that when Harris terminated the Agreement "at the time and in the manner in which it did," it breached its fiduciary duty. According to the complaint, Harris owed Trionic a fiduciary duty because: 1) the Agreement forbade Trionic from representing Harris' competitors; 2) Harris was Trionic's largest account; and 3) Harris dictated the terms of the Agreement and refused to negotiate the commission rates and the termination and remedy clauses. Trionic has, however, again failed to allege facts that would suggest that its relationship with Harris anything other than an arms-length commercial relationship; a relationship that cannot, as a matter of law, impose a fiduciary duty.

■ "Fiduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Capital Bank v. MVB, Inc.,* 644 So.2d 515 (Fla.App.1994). A fiduciary relationship may be implied when "confidence is reposed by one party and a trust accepted by the other." *Id.* Trionic has not alleged that it reposed trust in Harris that Harris affirmatively accepted. The mere fact that their relationship lasted 14 years does not give rise to a fiduciary duty. *Burger King v. Austin,* 805 F.Supp. 1007, 1020 (S.D.Fla.1992). Trionic's economic dependence on Harris does not, in and of itself, create a fiduciary relationship; "[t]he fact that one party places trust or confidence does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." *Lanz v. Reso-*

---

**8.** Trionic's fiduciary duty claim arises out of the contract with Harris. Florida law governs this claim.

*lution Trust Corp.*, 764 F.Supp. 176, 179 (S.D.Fla.1991).

Trionic contends that its relationship with Harris is comparable to the relationship between a service station owner and an oil company. It cites *Arnott v. American Oil*, 609 F.2d 873 (8th Cir.1979) and *Shell Oil Co. v. Marinello*, 120 N.J.Super. 357, 294 A.2d 253 (1972) in support of its argument that a franchisor owes a fiduciary duty to a franchisee based on the economic dependence of the franchisee. However, these cases are dissimilar in subject matter and are driven by public policy concerns not implicated in the case at hand. In addition, even if Trionic's relationship to Harris were that of a franchisee to a franchisor, the courts in Florida have held that a fiduciary duty does not generally arise from a franchisor/franchisee relationship. *Austin*, 805 F.Supp. at 1020.[9]

## IV. *Trionic's Claim Against Donald Ciardi*

Because Donald Ciardi left Trionic to work for Parallax on the Harris account, Trionic claims that he breached his Employment Agreement. Trionic also alleges, without elaboration, that Ciardi had acquired confidential and competitive business information while at Trionic. Trionic seeks damages for the loss of that information.

### A. *Enforceability*

■■ A restrictive employment covenant or "covenant not to compete" will be enforced to the extent that it is reasonable in duration and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee. *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976). The courts have identified two areas of legitimate interest. The first recognizes the need to prevent the ex-employee from disclosing or using trade secrets or confidential customer information. Trionic alleges that Donald Ciardi possessed "knowledge and experi-

ence" gained while working at Trionic. However, "[k]nowledge of the intricacies of a business operation does not necessarily constitute a trade secret and absent any wrongdoing it cannot be said that a former employee should be prohibited from using his knowledge and talents in this area." *Catalogue Serv. of Westchester v. Henry*, 107 A.D.2d 783, 484 N.Y.S.2d 615 (1985)

An employer also has a legitimate interest to protect if the employee's services are unique, special or extraordinary. *Reed*, 40 N.Y.2d at 303, 386 N.Y.S.2d 677, 353 N.E.2d 590. The courts have long held that an employer cannot insulate himself from competition from former employees. *Id.* When, however, an employee provides an employer's clients with "unique services," the courts have enforced covenants not to compete when they are designed to allow an employer to replace that employee, in an effort to retain its clients. *Maltby v. Harlow Meyer Savage, Inc.*, 166 Misc.2d 481, 633 N.Y.S.2d 926 (1995) (6 month covenant not to compete enforced where brokers had developed "unique relationships" with clients and where ex-employer compensated brokers during the 6 month period); *Ticor Title Insurance Co. v. Cohen*, 1998 WL 355420 (S.D.N.Y.) (6 month covenant enforced where vice president in insurance sales had developed special relationships with clients).

■■ Assuming Ciardi's services as a DSR were "unique," the Employment Agreement is enforceable insofar as it seeks to prevent Ciardi from exploiting his relationship with Trionic's accounts: either by luring away a Trionic account to a competitor, or by going "in-house" at an account, making Trionic's services unnecessary. *See Ticor*, 1998 WL 355420 (legitimate purpose of the covenant was to prevent the sales manager from taking with him the clients he developed while working for the employer); *Maltby*, 166 Misc.2d 481, 633 N.Y.S.2d 926 (brokers enjoined from working for a competitor when

---

**9.** This relationship most closely resembles that of a manufacturer to a distributor. The prevailing view in Florida, is that the parties to a distributor agreement stand at arms length and no fiduciary relationship exists. *Anthony Distributors, Inc. v. Miller Brewing Co.*, 882 F.Supp. 1024, 1031

(M.D.Fla.1995). In addition, the Agreement characterizes Trionic as an independent contractor. See Austin, 805 F.Supp. at 1020 (no fiduciary relationship where franchise agreement stated that franchisee was an independent contractor).

they had unique relationships with their clients developed at employer's expense).

### B. *Breach of the Employment Agreement*

█ There is no evidence, however, that Donald Ciardi lured Harris away from Trionic. Indeed, Trionic makes no such accusation. Rather, Trionic argues that the plain language of the Employment Agreement prohibits Ciardi from representing Harris, because it had been an account of Trionic's.

When Ciardi started work at Parallax on December 31, 1996, Harris was no longer an account of Trionic. Under the terms of the Employment Agreement, Ciardi could not, for a period of two years after leaving Trionic "represent ... any of the accounts of the Corporation...." While it may be that Trionic had a legitimate interest in preventing Ciardi from working for any of Trionic's *current* accounts, Trionic did not have a legitimate interest in preventing Ciardi from working for a *former* account. Indeed, enforcement of this somewhat ambiguous term at this point would do nothing more than punish Ciardi, and protect no legitimate interest of Trionic; Harris would still be gone.

### V. *Trionic's Claim against Parallax*

### A. *Tortious Interference with Ciardi's Employment Agreement*[10]

█ Trionic claims that Parallax tortiously interfered with the Employment Agreement between Ciardi and Trionic. This claim must fail because Trionic has not alleged that Parallax knew about the Employment Agreement when it hired Ciardi.

█ The elements of a tortious interference claim are: 1) the existence of a valid contract between the plaintiff and a third party; 2) defendant's knowledge of the contract; 3) defendant's intentional procurement of the third party's breach of contract without justification; 4) actual breach of the contract; and 5) damages resulting from the breach. *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (N.Y.1996). "[I]t

must be established, as a threshold predicate for any claim of tortious interference, that the alleged tortfeasor knew that his competitor had a contract with the third party...." *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). DeStephano testified that he was not aware of Ciardi's Employment Agreement, and Trionic has submitted no evidence to the contrary.

█ Trionic has conceded that even if it were permitted to amend, it could not tender evidence that Parallax knew of Ciardi's Employment Agreement. Trionic argues that it should be "permitted to argue and demonstrate at trial that Mr. DeStephano should have asked Ciardi if he was under a covenant not to compete." However, there is no action for negligent interference; intention and knowledge must be alleged and proven. *Alvord v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276, 413 N.Y.S.2d 309, 385 N.E.2d 1238 (1978). Finally, as seen above, Trionic would not be able to show another essential element, that the Employment Agreement was breached.

### B. *Tortious Interference with the Sales Representative Agreement*

Trionic's sixth claim alleges that Parallax wrongfully hired Ciardi in order to persuade Harris to breach the Sales Representative Agreement. Trionic's seventh claim alleges that Parallax wrongfully interfered with Trionic's expectation of economic benefit under the Agreement.

█■ "In order for the plaintiff to have a cause of action for tortious interference with contract, it is axiomatic that there must be a breach of that contract by the other party." *Jack L. Inselman & Co. v. FNB Financial Co.*, 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977). Again, Trionic has failed to come forth with evidence showing that Harris breached the Sales Agreement.

---

10. Trionic's fifth claim demands judgment against Harris as well. However, the claim itself alleges no improper behavior on Harris' part.

Even if the claim is read to apply to Harris, the same rationale that supports summary judgment in favor of Parallax, applies to Harris.

*Conclusion*

Trionic's claims against the defendants are dismissed. Trionic has failed in its Amended Complaint to properly plead many of its claims. Where it has properly pleaded those claims, or arrived at an articulation of those claims in their reply papers that would withstand a motion to dismiss, Trionic has failed to raise a material issue of fact warranting trial. The Clerk of the Court is directed to close this case.

SO ORDERED.